AO 91 (Rev. 11/11)   Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
Eastern District of California

FILED

May 13, 2021

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

| United States of America | ) | |
|---|---|---|
| v. | ) | Case No.    2:21-mj-0076 DB |
| Wilmer HARDEN, Maurice BRYANT, Tyrone ANDERSON, Charles CARTER, Bobby CONNER, Jerome ADAMS, Dwight HANEY, Arlington CAINE, and Mark MARTIN | ) ) ) ) ) | |

## SEALED

*Defendant(s)*

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

| Between on or about the date(s) of | February 19, 2019 and March 19, 2019 | in the county of | Sacramento | in the |
|---|---|---|---|---|

| Eastern | District of | California | , the defendant(s) violated: |
|---|---|---|---|

| *Code Section* | *Offense Description* |
|---|---|
| 21 U.S.C. §§ 841 and 846 | Conspiracy to Distribute and Possess with Intent to Distribute Cocaine and Cocaine Base. |

This criminal complaint is based on these facts:

(see attachment)

☒ Continued on the attached sheet.

                                                      /s/ Brian Nehring

                                                 *Complainant's signature*

                                               Special Agent Brian Nehring
                                               Drug Enforcement Administration
                                               *Printed name and title*

Sworn to before me and signed telephonically.

| Date: | May 13, 2021 | |
|---|---|---|

                                                 DEBORAH BARNES

| City and state: | Sacramento, California | |
|---|---|---|

                                                 UNITED STATES MAGISTRATE JUDGE

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT, ARREST WARRANTS & SEARCH WARRANTS

I, Drug Enforcement Administration Special Agent Brian Nehring, being duly sworn, hereby state:

1.     This Affidavit is submitted in support of a Criminal Complaint charging:

   a.     Wilmer HARDEN, Maurice BRYANT, Tyrone ANDERSON, Charles CARTER, Bobby CONNER, Jerome ADAMS, Dwight HANEY, Arlington CAINE, and Mark MARTIN with violating 21 U.S.C. §§ 841 and 846 – conspiracy to distribute and possess with intent to distribute cocaine and cocaine base.

2.     This affidavit is also made in support of Search Warrants for the following locations:

   a.     8451 Buford Court, Antelope, California (the residence of Maurice BRYANT);

   b.     450 Greg Thatch Circle, Sacramento, California (the stash pad of Maurice BRYANT); and

   c.     6105 Pine Vista, Elk Grove, California (the residence of Wilmer HARDEN).

3.     I am a special agent of the Drug Enforcement Administration (DEA), San Francisco Field Division, and have been so employed since 1991.  I have had numerous DEA assignments, including the San Francisco Division Office between 1991 and 1994, the Alameda County Narcotics Task Force between 1995 and 1996, the San Francisco Division Clandestine Laboratory Enforcement Team from 1997 to 1999, the Oakland Resident Office between 1999 and 2002, and the Mobile Enforcement Team (MET) between 2002 and 2004.  I have been assigned to the Sacramento Division Office since September of 2004.

4.     I have received specialized training in narcotic investigation matters including, but not limited to, drug interdiction, drug detection, money laundering techniques and schemes, drug identification, and asset identification and removal, from the Drug Enforcement Administration (DEA).  I graduated from the DEA Basic Agents Academy at the FBI Academy at Quantico, Virginia.  In total, I have received in excess of 500 hours of comprehensive formalized classroom instruction in those areas outlined above.

5.     I have assisted in the execution of more than four hundred warrants to search particular places or premises for controlled substances and/or related paraphernalia, indicia and other evidence of violations of federal drug narcotics

statutes. As a result, I have encountered and become familiar with various tools, methods, trends, and paraphernalia and related articles utilized by traffickers in their efforts to import, conceal, manufacture and distribute controlled substances. Central to all trafficking efforts, regardless of the drug, is the traffickers' effort to make a profit from those dealings or transactions, either for the purchase of additional substances or material gain.  I have been actively involved as case agent in over two hundred investigations and have talked with confidential informants involved in the trafficking of narcotics.

6.      I have been qualified as and have testified as an expert witness in both federal and state court in the Northern and Eastern Districts of California and in counties including Alameda, Contra Costa, Solano, and Sacramento.  These areas of qualification have included possession for sale, possession with intent to distribute, and manufacturing of a controlled substance.

## PROBABLE CAUSE

### Overview

7.      The Court authorized Title III intercepts of BRYANT's telephone, TARGET TELEPHONE 2, in February 2019.  As detailed below, during these intercepts, BRYANT was identified as obtaining kilogram quantities of cocaine and cocaine base from Wilmer HARDEN and subsequently partnering with and distributing large quantities of cocaine and cocaine base to his drug distribution network: Tyrone ANDERSON, Charles CARTER, Bobby CONNER, Mark MARTIN, Dwight HANEY, and Arlington CAINE.

      a.      **Wilmer HARDEN** partnered with BRYANT in the distribution of kilograms of cocaine and cocaine base.  In demonstration of a longstanding trusted drug-dealing relationship, BRYANT and HARDEN frequently discussed the challenges of obtaining powder cocaine from HARDEN's sources, the prices HARDEN was paying his sources, the prices for which BRYANT was selling the cocaine, and the rise in cocaine prices over the years.  They also discussed strategy for downstream distribution, the logistics of moving and distributing cocaine out of state, and plans to avoid detection from law enforcement after the arrest of one of BRYANT's sub-distributors.

      b.      **Tyrone ANDERSON** was one of BRYANT's biggest customers. BRYANT supplied large quantities of powder cocaine to ANDERSON and partnered with ANDERSON in the planning and coordination of down-stream distribution of cocaine base and powder cocaine, to include four kilograms sold to Carlton COLLINS on July 23, 2018, and seized by law enforcement.  During the course of the Title III wiretap, in demonstration of a long-standing trusted relationship, BRYANT and ANDERSON discussed their collective business, including the quality of

2

the drugs, the price BRYANT was paying his drug source(s), the difficulty of getting drugs into the country, and the details of collecting money and finding customers. They also appeared to meet in person every few days for large-quantity drug transactions.

c. **Charles CARTER** partnered with BRYANT to distribute large quantities of cocaine, cocaine base, and heroin. In demonstration of a long-standing drug-dealing partnership, they used code to discuss their drug dealing business, BRYANT fronted drugs to CARTER, and CARTER worked to find alternative cocaine and heroin sources for BRYANT. As evidence of their trusted partnership, CARTER told BRYANT about his plan to rob a separate heroin source and how he intended to avoid retaliation from that source.

d. **Bobby CONNER** was one of BRYANT's frequent, large-quantity cocaine and cocaine base customers and drug-dealing partners. Using simple coded language – *e.g.*, "same," "one," "hard," and "soft" – they conducted regular quarter-kilogram cocaine and cocaine base transactions and discussed turning cocaine into cocaine base. CONNER talked about his down-stream drug dealing business with BRYANT, and BRYANT trusted CONNER to visit his stash pad to collect drugs.

e. **Jerome ADAMS** was one of BRYANT's highest-frequently contacted customers for cocaine, cocaine base, and heroin. As evidence of a long-standing, trusted partnership, BRYANT and ADAMS spoke in code – *e.g.*, "pops," "black," and "hard" – and discussed converting cocaine into cocaine base, the quality of the drugs, and customer reactions to the drugs. They also discussed efforts to get a new sub-distributor to step in after the arrest of one of BRYANT's other sub-distributors, James McCurin.

f. **Dwight HANEY** was one of BRYANT's frequent, high-quantity cocaine base partners and sub-dealers. In demonstration of a long-standing, trusted partnership, BRYANT and HANEY discussed converting cocaine into cocaine base ("cooked it good"), customer preferences, and downstream distribution. BRYANT also fronted drugs to HANEY on credit.

g. **Arlington CAINE** was one of BRYANT's regular high-quantity cocaine and cocaine base customers and partners. In demonstration of a trusted, long-term drug-dealing relationship, CAINE regularly used coded language to order quarter kilograms of cocaine and cocaine base from BRYANT. CAINE was one of the only customers to whom BRYANT personally delivered drugs.

h. **Mark MARTIN** was a cocaine base sub-dealer for BRYANT. He met BRYANT on at least five occasions during the 30-day interception for

3

drug transactions.  As evidence of their trusted partnership, they used coded language to discuss MARTIN's distribution activities and customers, and BRYANT allowed MARTIN to go inside his cocaine base stash location to conduct drug transactions.

**Title III Intercepts of Tyrone ANDERSON over TARGET TELEPHONE 1 in July and August 2018 identified BRYANT as multi-kilogram source of supply**

8.      On July 12, 2018, United States District Judge Troy L. Nunley authorized the wire interception of Tyrone ANDERSON's self-reported telephone (916) 207-0420, TARGET TELEPHONE 1.  Interception started on July 16, 2018.

9.      Prior to the beginning of this interception, I determined that ANDERSON's identified telephone was in regular high-frequency contact with the self-identified cellular telephone for Maurice BRYANT. BRYANT has prior felony convictions for Possession of Cocaine Base for Sale in 1990 and 1993 in Sacramento.

10.     The day interception of **TARGET TELEPHONE 1** began on July 16, 2018, agents intercepted ANDERSON using **TARGET TELEPHONE 1** to contact BRYANT at 916-208-4414 (**TARGET TELEPHONE 2**) to discuss ANDERSON's intention to obtain kilogram quantities of cocaine and cocaine base from BRYANT and BRYANT's ability to supply those drugs.  On the day interception began, BRYANT asked ANDERSON in coded language if he had the money for drugs, and ANDERSON said he had $30,000 in cocaine and/or cocaine base fronted to customers who owed him money.  BRYANT and ANDERSON went on to discuss BRYANT retrieving one kilogram for ANDERSON and agreeing to contact ANDERSON with a price.  Shortly thereafter, BRYANT sent a text message from **TARGET TELEPHONE 2** to ANDERSON at **TARGET TELEPHONE 1**: "26500."  I know from my training and experience that $26,500.00 was the approximate average price for a kilogram of cocaine in the Sacramento area in 2018.

11.     Beginning on July 18, 2018, and continuing on multiple occasions through August 15, 2018, agents monitored BRYANT informing ANDERSON that he (BRYANT) was prepared to go meet his "people" (his cocaine sources of supply)[1] and ANDERSON agreeing to get his "change together" (collect his money to purchase the drugs).  Following these conversations, BRYANT and ANDERSON were intercepted arranging meetings for BRYANT to pick up the money.  On July 18, 2018 and multiple subsequent occasions through mid-August 2018, agents observed BRYANT meeting with ANDERSON at various locations, including ANDERSON's house, his suspected drug storage location (stash pad),

---

[1] Parentheticals throughout this affidavit contain my interpretation of vague and/or coded language that is based on my training, experience, and knowledge of this investigation.

and public locations, to pick up money (transfer of bags and boxes) and then on almost all of those occasions traveling back to the residence of BRYANT's common-law wife (Tia Bryant) at 541 N Street, Rio Linda, California where BRYANT also apparently lived.  BRYANT would remain for a time at the N Street residence, leave (most times carrying a bag to a vehicle), and then use **TARGET TELEPHONE 2** to contact ANDERSON at **TARGET TELEPHONE 1** to make arrangements regarding where to meet for BRYANT to deliver the drugs.  During these calls, BRYANT discussed "soft" (*i.e.*, powder cocaine) and "hard" (*i.e.*, cocaine base).

**July 23, 2018 intercepts and surveillance showing BRYANT and ANDERSON supplying Carlton COLLINS with four kilograms of powder cocaine**

12.     After interception of TT#1 began, agents monitored ANDERSON and BRYANT having extensive discussions about the rise in prices for kilogram quantities of cocaine.  Based on my training and experience and knowledge of the investigation, I believe that in these calls, they discussed the fact that ANDERSON had a particular customer coming into town who wanted to purchase multiple kilograms of cocaine but ANDERSON feared that he would lose this customer due to the rise in price per kilogram that BRYANT was quoting.  During this same time period, agents intercepted ANDERSON communicating in text messages and calls with an individual subsequently identified as Carlton Collins and quoting a price of $28,500.00 per kilogram of cocaine.  BRYANT assured ANDERSON that Collins would accept the price increase because he was aware of the quality of cocaine they had supplied Collins in the past.

13.     On the days leading up to July 23, 2018, ANDERSON and BRYANT were intercepted numerous times discussing preparations to have drugs ready for Collins when he came into town.  ANDERSON related that he was "counting up that change," alluding to the money, and BRYANT related that "my boy Unc will be bringing it to me at 8," alluding to the subsequent delivery of the cocaine.  Following these calls and subsequent text messages with Collins, ANDERSON and BRYANT were observed meeting for what I believe was the delivery by ANDERSON to BRYANT of the money.  Again, BRYANT was followed directly to the N Street residence following this exchange and ANDERSON was followed to his industrial warehouse shop at **4946 Watt Avenue, Unit 35, North Highlands, California**.  Shortly thereafter, Collins was observed arriving at the agreed-upon warehouse location in a rental vehicle.  He carried inside a large backpack believed to contain the $116,000.00 for the four kilograms of cocaine they had agreed to transact.  BRYANT was then followed from his residence directly to ANDERSON's industrial warehouse where he was observed carrying a large box inside, which I believe was the cocaine.  A short time later, COLLINS was observed carrying out the same large backpack to his rental vehicle and driving away.  A short distance away, a California Highway Patrol officer pulled

over COLLINS for a traffic violation.  A narcotics detection canine alerted to the vehicle, and a subsequent search of the vehicle turned up the backpack COLLINS was carrying into and out of the warehouse.  The backpack contained four rectangular bricks of suspected cocaine.  COLLINS was arrested on state narcotics violations and ultimately convicted and sentenced. The DEA Western Regional Laboratory subsequently analyzed this substance and found it to be over **4000 grams of cocaine**.  I spoke to Collins following his arrest, and he admitted to traveling to California from Pennsylvania, where he lived.

**BRYANT and ANDERSON continue to engage in narcotics-related communications during the interception of TT#1.**

14.     Following this seizure, BRYANT and ANDERSON continued to engage in narcotics-related calls and text message repeatedly in August 2018, and to meet every few days (as observed by agents) for what I believe based on the calls and context of the meetings, were money and narcotics exchanges.  A typical example of this was August 9, 2018, when ANDERSON, using **TARGET TELEPHONE 1**, and BRYANT, using **TARGET TELEPHONE 2**, were intercepted discussing ANDERSON needing "two of that for tomorrow" (*i.e.*, two kilograms of cocaine) and ANDERSON indicating he was going to "get the change for that and shoot for today" (*i.e.*, collecting the money for the two kilograms and giving it to BRYANT).

15.     BRYANT related during subsequent calls that he had spoken to his source of supply and that he did not know when it was going to happen, as "whatever happened yesterday in L.A., it was kind of big."  I noted at the time from a review of media articles that an extremely large seizure of cocaine had occurred the previous day in Los Angeles, California and was reported nationally.  BRYANT indicated that his source of supply was waiting on BRYANT to call him back and that BRYANT was going to call ANDERSON back and let ANDERSON know. Shortly thereafter, BRYANT used **TARGET TELEPHONE 2** to send ANDERSON a text message: "We Good."  Later that evening, ANDERSON was intercepted contacting BRYANT and relating that BRYANT could come by ANDERSON'S warehouse to pick up the money, which BRYANT agreed to do. Based on subsequent text messages, BRYANT met with ANDERSON to conduct another deal.  Later that evening (11:32 p.m.), BRYANT used **TARGET TELEPHONE 2** to send ANDERSON a text message: "Im back dog."  At 11:44 p.m. ANDERSON texted: "Here."  I believe based upon these intercepts that BRYANT delivered the kilograms of cocaine to BRYANT.

16.     Between August 10 and 14, 2018, ANDERSON continued to contact BRYANT to inquire about the availability of additional kilograms of cocaine.  BRYANT continued to indicate that he was speaking with his sources of supply but that the seizure in Los Angeles had temporarily affected the availability of multiple kilogram quantities of cocaine.  On August 14, 2018, BRYANT related that he believed a large amount would be available in a few days, but prices were around

"85" ($28,500, per kilogram).  BRYANT related that he currently only had "hard" (cocaine base) no "soft" (powder cocaine) and that one of his sources "came through" but "the other people haven't come through yet" who had "the other ones" for "a dollar less" (the other sources who had kilograms of cocaine for $1000 per kilogram less).  ANDERSON asked if they would "cut a break for 2" (lower the price for two kilograms), and BRYANT said he would "give him a call later on today."  BRYANT laughed and said he "knew it was going to go up," but that he "didn't think it would be that much."

17.     On August 15, 2018, the last day of interception of TARGET TELEPHONE 1, I assisted in the service of a search warrant at the residence of Michael HAMPTON, one of ANDERSON's suspected cocaine/cocaine base partners and customers.  Shortly thereafter, I believe ANDERSON became aware that HAMPTON had been the target of a search warrant, as ANDERSON discontinued the use of TARGET TELEPHONE 1 and obtained a new phone the same day.  The new phone, with number **916-990-7273**, was another pre-paid Verizon cellphone and displayed a nearly identical calling pattern as TARGET TELEPONE 1.  As of January 2019, this phone continued to have high-frequency contact with BRYANT over TARGET TELEPHONE 2.

**Identification of Wilmer HARDEN as BRYANT's suspected kilogram-quantity cocaine source of supply.**

18.     During the period of interception of TARGET TELEPHONE 1, I noted numerous instances when BRYANT, using TARGET TELEPHONE 2 indicated to ANDERSON that he was going to speak to, or had spoken to, his sources of supply for kilogram quantities of cocaine.  I examined the court-authorized pen register for TARGET TELEPHONE 2 for the period July 20, 2018 through August 14, 2018.  I noted that on most occasions immediately prior to or after BRYANT referenced communicating with his cocaine sources, BRYANT called **916-969-9748**.  This led me to believe that BRYANT's source of supply was using this telephone number during this period.

19.     Inquiries with Verizon revealed that the number **916-969-9748** was subscribed to "Carl BANKS" at an address that corresponded to an elementary school.  Per commercial records, no one by the name "Carl BANKS" was connected to this school, the street address, or the area, leading me to believe that this was a false name and address used to avoid identification by law enforcement.

20.     Intelligence Analyst (IA) Matthew Kregor collected and analyzed the tolls for the "Carl BANKS" subscribed telephone between September and October 2018.  This phone continued to have high-frequency contact with **TARGET TELEPHONE 2** during that period.  IA Kregor analyzed the tolls for **TARGET TELEPHONE 2** and the "Carl BANKS" telephone and noted that there was one particular number with which they were both in high-frequency contact: **916-281-5995**.  Inquiries with Verizon revealed that this number was subscribed in the name of "Michael KRAFCHUK."  Commercial database inquiries revealed that the only

7

listed Michael KRAFCHUK in the region had never provided this number as a contact number in any capacity. However, IA Kregor determined that this telephone number had been linked to the Facebook Social Media account of Dwight HANEY. Subsequent analysis of the tolls for this telephone number showed it in contact with identified relatives of HANEY. For these reasons, I believe HANEY was the actual user of **916-281-5995**.

21.    IA Kregor confirmed that use of the "Carl BANKS" subscribed telephone was discontinued in October 2018, and **TARGET TELEPHONE 2** had no further contact with that number. However, immediately following the discontinuation of this telephone in October 2018, **TARGET TELEPHONE 2** began having high-frequency contact with a new telephone (**916-413-6744**), which Verizon records revealed was initiated on 10-10-2018. Analysis of the tolls for this telephone showed that it had a nearly identical calling pattern as the "Carl Banks" telephone, which led me to believe that this was the replacement telephone for the "Carl Banks" telephone and was being used by the same person to communicate for drug distribution purposes with same people, including BRYANT at **TARGET TELEPHONE 2.**

22.    Inquiries with Verizon revealed that telephone number **916-413-6744** was at that time a cellphone subscribed in the name of Chris HARDEN at "209 Onstead," Sacramento, California. I know that 209 Olmstead Drive, Sacramento had consistently been provided as the resident address of Wilmer HARDEN. Chris HARDEN was identified by IA Kregor through multiple database checks as the son of Wilmer HARDEN. I therefore formed the opinion that Wilmer HARDEN was the user of the "Carl Banks" telephone and the 916-413-6744 telephone.

23.    HARDEN has a significant criminal history for drug offenses including felony convictions for possession for sale of cocaine base in 2009 and 2012. Following his last arrest, HARDEN admitted to me that he supported himself through the sales of cocaine and cocaine base. In 2004, BRYANT and HARDEN were stopped together in Texas in a vehicle that was found to contain $368,490.00 in suspected drug proceeds that was forfeited. In 2015, HARDEN had $28,000.00 of suspected drug currency seized from his carry-on bag at the San Francisco International Airport.

**HARDEN observed sourcing cocaine to BRYANT during the interception of ANDERSON's phone, TARGET TELEPHONE 1.**

24.    On July 18, 2018, ANDERSON was intercepted on TARGET TELEPHONE 1 requesting kilogram quantities of cocaine from BRYANT. On this date, ANDERSON arranged for BRYANT to come to ANDERSON's Roseville, California residence to pick up the money for the cocaine. I observed BRYANT meeting with ANDERSON in front of that location. Following this meeting, BRYANT was followed to his common-law-wife's (Tia BRYANT's) residence at 541 N Street, Rio Linda, California. He entered briefly and was then observed

leaving the residence carrying a box back to his vehicle. BRYANT was then followed directly to the Christian Brothers High School parking lot where he was observed meeting with Wilmer HARDEN, who appeared to have come from the football field where there was an ongoing practice. HARDEN retrieved a white bag from a Honda, which he then carried to BRYANT's vehicle. He then entered BRYANT's vehicle through the front passenger door. When HARDEN exited the vehicle moments later, he no longer had this bag.

25.     Immediately following this brief meeting, BRYANT drove out of the parking lot and engaged in subsequent intercepted calls with ANDERSON indicating he was about to deliver the drugs. BRYANT proceeded directly to ANDERSON's stash house at 7308 Hamerbee Court in North Sacramento, California where he was observed carrying a package into the garage and meeting with ANDERSON in front. I know that ANDERSON uses this location as a stash pad as per the intercepts and surveillance ANDERSON was observed carrying drugs and money into and out of this location repeatedly and had only certain people, including BRYANT and ANDERSON's closest co-conspirators meet at this location. Based upon this surveillance and these intercepts and my training and experience, I believe that BRYANT likely obtained the drugs he delivered to ANDERSON that day from his partner and source, HARDEN.

**HARDEN confirmed as BRYANT's kilogram cocaine source of supply during interception of BRYANT's phone, TARGET TELEPHONE 2**

26.     On February 15, 2019, U.S. District Judge Troy L. Nunley authorized the wire and electronic interception of BRYANT's telephone, TARGET TELEPHONE 2 Interception began on February 19, 2019.

27.     At 6:24 p.m. on February 19, 2019, BRYANT received an incoming call from HARDEN at 916-413-6744. BRYANT asked HARDEN if his "boy" was still trying to get something from his folks. HARDEN responded that this person was about to get "a dime or a dub" but had "backed up" because the third parties wanted a "seven-day window." BRYANT expressed skepticism and stated that the only way to make that work for the third parties was if they were talking about "a quarter." HARDEN affirmed that it would have to be "24 or a quarter otherwise it wouldn't work" and that if they got there then they "could meet the demand." HARDEN stated that they were already trying to move it fast, and BRYANT responded that it would not move with numbers like that and the number had to "be beat by a few stacks to get it to move." HARDEN asked BRYANT if everything was alright with the "other thing," and BRYANT responded that he was trying to "get the bread back" to "make another move." I believe, based on my training and experience and my analysis of prior intercepted conversations involving BRYANT, that in this conversation, HARDEN said he spoke to the kilogram cocaine source of supply who was going to be receiving between 10 and 20 kilograms (a "dime" referring to 10 and a "dub" being common vernacular for 20), but that the source was surprised that his own sources

wanted it sold in a week ("a seven day window"). I also believe that BRYANT and HARDEN were referring to the price having to be lowered to $24,000 or $25,000 per kilogram ("24" or "a quarter") for that much cocaine to move, and that at least a few thousand dollar reduction ("a few stacks") per kilogram would be required for it to be sold that quickly. BRYANT was referring to collecting drug proceeds ("bread") so they could purchase more cocaine ("make another move").

28.     That same day, February 19, 2019, BRYANT and HARDEN had an extensive conversation about purchasing several vehicles for an unknown venture. BRYANT said that when they started getting "that thing" together they knew it was going to be getting back. HARDEN stated that "when the weight was light it was manageable but now that it's heavier it's harder." BRYANT stated he had people who could move it, but that they needed different vehicles to line up different areas "like the gambling section and then the next section." I believe based on my training and experience and the context of these calls that in this conversation, BRYANT and HARDEN were referring to smuggling drugs with cars through Las Vegas ("the gambling section") north and east ("the next section"). I believe BRYANT and HARDEN were discussing obtaining vehicles to transport kilograms of cocaine east out of California and that they were referring to the increased weight necessitating multiple vehicles.

29.     During this same call on February 19, 2019, BRYANT and HARDEN discussed a female who was "pushing" "opium." BRYANT said that "they" were "slicing it" with the "fenty" (fentanyl) and the "Chinese," which he said was the "normal way" to do it. I believe based on my training and experience, that in this conversation, BRYANT and HARDEN were discussing a third party distributing heroin ("Opium") adulterated with fentanyl ("fenty") and/or powder heroin ("Chinese").

30.     BRYANT then told HARDEN during the same call that his "boy" was going to Reno, Nevada and getting "93, 92 out of a nip." I believe based on my training and experience that BRYANT was referring to one of his customers selling quarter kilograms of cocaine for $9,300 or $9,200. A "nip" is common slang for a quarter kilogram cocaine. "NP" is also shorthand for "nine pack," which is 9 ounces, or a quarter kilogram of cocaine.

31.     HARDEN told BRYANT that HARDEN's "boy" said sometime next month it would be "a flat 27." BRYANT asked "7-2 or 7-3 or one of them?" HARDEN confirmed 27. I believe based on my training and experience that HARDEN was telling BRYANT that HARDEN's source would have a kilogram of cocaine available for $27,000 in the next month. HARDEN and BRYANT then reminisced for an extended period of time about how far prices had risen over the years and how the quality was so much better in the past.

**February 20-24, 2019: ANDERSON orders one kilogram of cocaine from BRYANT who in turn obtains it from HARDEN and then delivers it to ANDERSON**

32.    On February 20, 2019, BRYANT received a call from ANDERSON from 916-990-7273, the then-current number used by ANDERSON.  ANDERSON asked BRYANT how it was looking.  BRYANT said it was slow and that he had "about six left" but would probably "be ready in a minute."  ANDERSON asked, "what your folks say, the numbers still the same?" and BRYANT said, "not yet, talked to him the other day."  ANDERSON said, "I talked to my people . . . he said he had two-six right now and should be on his way in a minute." BRYANT asked, "that your normal boy you been fucking with before?" ANDERSON confirmed that it was.  BRYANT told ANDERSON he would call his "boy" and then call ANDERSON back in a minute.  I believe based on my training and experience and knowledge of this investigation that in this call, ANDERSON asked BRYANT for kilograms of cocaine.  He inquired if the price ("the number") was the same and stated that his own customer would be coming with "two-six," an amount of money, to get it soon.  BRYANT then indicated it should be available soon and he would call his own source.  I believe, based on the call below, that the source BRYANT referenced was HARDEN.

33.    Shortly after the above exchange, BRYANT received an incoming call from HARDEN.  HARDEN told BRYANT that "I just spoke to my boy, he at two-seven."  BRYANT said "I got someone on the line . . . I don't know when he gonna call back." HARDEN said, "they still waiting . . . they should have had something flow through by now."  BRYANT said he had talked to someone else and "they ain't had nothing since before Christmas . . . transportation or some shit they talking about… . . . been a few different people paying that same thing." HARDEN then said, "I'm just letting you know it's all good."  BRYANT responded, "I just talked to him thirty minutes ago and when he call me back I'll be needing them." HARDEN again confirmed it was good.  I believe based on my training and experience and the surrounding context that during this call, HARDEN said that he had spoken to his kilogram cocaine source of supply who wanted $27,000 per kilogram and that it would be ready shortly.  BRYANT responded that he had just spoken to a an individual (ANDERSON) who he expected to call back shortly, and that he would then call HARDEN back.

34.    At 9:38 p.m. on February 21, 2019, BRYANT called ANDERSON back after missing several calls.  ANDERSON asked, "how we looking?" and BRYANT responded "I should have a rack tomorrow . . . I ain't that far, probably like 800 away." ANDERSON told BRYANT that "I am going out of town tomorrow and I'm trying to see something before I left."  BRYANT asked what, and ANDERSON said, "my usual."  ANDERSON asked if it was possible to get it that evening as he was leaving at 11 a.m. the following day, and BRYANT said, "Let me try calling him."  At 9:54 p.m., immediately following the below-described call with HARDEN, BRYANT called ANDERSON and advised him it

11

would be ready early in the morning, between 7 and 9 a.m.  ANDERSON said he
would be gone until Sunday.  BRYANT told him that he would call him around 7
a.m. the next day.  I believe based on my training and experience and my analysis
of subsequent calls with HARDEN (summarized below) that during these calls,
ANDERSON requested to purchase a kilogram of cocaine and BRYANT
confirmed that they could do the transaction in the morning.

35.     At 9:47 p.m. that night, BRYANT called HARDEN and said that ANDERSON
had called and "wanted to see if he could get one."  HARDEN asked, "the whole
key?" and BRYANT responded yes but that he had told ANDERSON it was too
late.  HARDEN confirmed he needed advanced notice.  BRYANT related that he
would call ANDERSON and tell him it would be early in the morning, and
HARDEN told BRYANT to let him know for sure so he could be ready.
Following the subsequent call with ANDERSON (described above), BRYANT
immediately called HARDEN back at 10:04 p.m. and asked if they could do it
early, like 7:15 a.m.  HARDEN said he did not know yet but thought it would be
around 10 a.m.  I believe that during these calls, BRYANT requested the kilogram
of cocaine for ANDERSON, and HARDEN said that he believed he could
provide it in the morning.

36.     At 7:08 a.m. the next morning, February 22, 2019, HARDEN sent BRYANT a
text message: "What you think dog."  Between 7:09 a.m. and 7:41 a.m.,
BRYANT exchanged a series of six unmonitored calls with HARDEN and
ANDERSON.  I believe based on my training an experience and the pattern of
behavior among these three, that during these communications, HARDEN,
BRYANT, and ANDERSON were arranging the anticipated drug transaction
discussed the previous evening.  At 8:04 a.m., BRYANT called ANDERSON and
told him that he was outside pulling up, which I believe was BRYANT arriving at
ANDERSON's location to obtain the money.  At 8:19 a.m., BRYANT received
an incoming call from HARDEN and told him he was "going through some
change," *i.e.*, counting the money he had just obtained from ANDERSON.
HARDEN related that he was in Elk Grove "waiting on him," – *i.e.*, the source for
the cocaine – and that it was all good and he would head BRYANT's way as soon
as he got it.

37.     At 9:10 a.m. that same morning, BRYANT sent HARDEN a text: "Im ready."  At
9:22 a.m., HARDEN called BRYANT and told him he had to meet his cousin at
IHOP on Northgate for breakfast and that "I got that with me and I got the other
thing too," which I believe means that he had obtained the kilogram of cocaine for
ANDERSON as well as additional drugs most likely meant for BRYANT.
HARDEN suggested that BRYANT meet him at that location "and snatch it from
me right here."  BRYANT agreed to this and told HARDEN he would call him
when he was close.  At 9:26 a.m., HARDEN called BRYANT back and told him
"bring most of what you got left of yours so I can give to him to."  BRYANT
responded, "I got six."  I believe this was HARDEN instructing BRYANT to
bring him the proceeds from the sales of the cocaine that HARDEN and

12

BRYANT had been fronted by their source so that HARDEN could give the money to his source.

38. Surveillance agents observed BRYANT shortly thereafter departing his residence on N Street in a red Kia and proceeding directly to the agreed-upon restaurant on Northgate Boulevard. Prior to BRYANT arriving, agents had entered the restaurant and observed HARDEN at a table eating with several people. BRYANT subsequently called HARDEN and advised him he had arrived and was outside, and agents observed HARDEN exit the restaurant and walk around the side of the building to an area where BRYANT had parked his vehicle. Agents briefly lost sight of them but shortly thereafter observed HARDEN exiting BRYANT's vehicle and BRYANT departing. Immediately after separating, at 10:29 a.m., BRYANT called ANDERSON and related that he was arriving to meet him with the cocaine.

39. On February 24, 2019, at 12:16 p.m., BRYANT called HARDEN. HARDEN said he had returned later than he thought the previous evening. BRYANT requested to meet HARDEN at the Flea Market on Folsom Boulevard in Sacramento. During subsequent calls, BRYANT told HARDEN to drive through a specific entrance and that he could see HARDEN and to drive to where BRYANT was standing. Agents concurrently observed HARDEN arrive at that location. BRYANT, who was already there, walked over to HARDEN's vehicle as HARDEN drove up in the parking lot, and agents observed BRYANT conversing with HARDEN through the open window. I believe that these calls and this subsequent meet were the follow up to the call from HARDEN the previous day during which HARDEN asked whether BRYANT had sold some of the additionally-fronted cocaine and had money for HARDEN to give to his own source for the cocaine. I believe that BRYANT gave HARDEN some of the owed money during this meeting.

40. At 6:08 p.m., BRYANT received a call from ANDERSON who said he had just returned. ANDERSON asked, "Did you ever go do something?" BRYANT said yes and then said, "I will get with you in the morning to bring you that . . . the rest of that." I believe based on my training and experience and the context of these calls that ANDERSON was inquiring as to whether BRYANT had additional cocaine. BRYANT then confirmed he did have additional cocaine and said he would bring it to ANDERSON the following day.

**March 2, 2019: BRYANT obtains ¼ kilogram cocaine from HARDEN and distributes it to ANDERSON**

41. At 10:23 a.m. on March 2, 2019, BRYANT received a call from HARDEN. HARDEN asked BRYANT what happened yesterday, and BRYANT said, "I was waiting on him to hook up, but it was going to be too late." BRYANT related that he would have to go with the third party and the third party would have to bring BRYANT back. BRYANT said, "he wants 3 of them things . . . three nips" and

that he was waiting for a call now and "there might be one later too."  HARDEN responded, "Ok I am about to hit my folks . . . see what's up."  BRYANT said he would get a call in 15 minutes and would call HARDEN back.  I believe based on my training and experience and work on this case that in this call, BRYANT indicated it was too late for him to meet with ANDERSON to obtain the money the previous evening but that ANDERSON wanted three "nips," *i.e.*, nine pack and/or nine ounce quantities (quarter kilograms) of cocaine and possibly a fourth quarter kilogram right afterwards. I believe that HARDEN indicated he would call his source and find out.

42.     At 10:42 a.m., BRYANT called HARDEN and asked, "Did you already get the nip [quarter kilogram of cocaine] from last night?"  HARDEN responded that he had not.  BRYANT said, "Let's do the nip right now and dude can check it out and then will do the rest after that."  HARDEN responded, "I have that right now so it will be one minute."  BRYANT then said, "I am gonna get with them in 20 minutes to get the milk money."  I believe based on my training and experience and analysis of prior conversations between BRYANT and HARDEN that in this call, BRYANT was suggesting obtaining the initial quarter kilogram of cocaine from HARDEN to show ANDERSON the quality and that they would conduct the transaction for the remaining amount later.

43.     At 11:12 a.m., BRYANT called HARDEN and told him he was ready as he had just "got that shit for the nip."  HARDEN said okay and he would "get that in a minute."   At 12:01 p.m., BRYANT called HARDEN and asked what time HARDEN wanted BRYANT to be there.  HARDEN replied he was picking it up right now so he would hit BRYANT in a second.  In a call 50 minutes later, HARDEN and BRYANT agreed to meet at a bar off El Camino Boulevard in Sacramento.  At 1:07 p.m., BRYANT told HARDEN he was arriving, and HARDEN said he would be there in 2 minutes in a red car.

44.     Surveillance subsequently observed BRYANT arrive at this location.  They then observed HARDEN arrive in a red Lexus registered in his name and park next to BRYANT's vehicle and BRYANT get into the passenger side of HARDEN's vehicle during which time I believe that BRYANT purchased the initial quarter kilogram of cocaine for ANDERSON from HARDEN.  As summarized below, I believe that BRYANT obtained cocaine for ANDERSON and other customers during his transaction with HARDEN, as he subsequently distributed cocaine to various of his partners and customers later that day, including Dwight HANEY, Arlington CAINE, and Bobby CONNER.

**March 5-6, 2019: ANDERSON obtains two kilograms of cocaine from BRYANT, sourced by HARDEN.**

45.     On March 5, 2019, at 7:12 p.m., ANDERSON called BRYANT.  BRYANT said his "sales are way low . . . a couple of my people got arrested . . . it's way hard."  BRYANT said that "my people (customers) get at me any time of the day or night

14

. . . just as long as it isn't some 1 or 2 o'clock in the morning bullshit." BRYANT asked ANDERSON if "you leave yet . . . you do that out the way-way thing yet" and ANDERSON said no not yet. After some more general conversation, ANDERSON said to let him know. BRYANT asked if he was "ready to do 55 or 45 yet?" ANDERSON said yes as long as BRYANT was ready. BRYANT said he was going to call his boy and "set a fire." BRYANT said he did not know how close they were and that he had been told last night that it would be tonight. BRYANT said he would see what was happening, and ANDERSON said to let him know what was up. Based on my training and experience and analysis of prior conversations between ANDERSON and BRYANT, I believe that during this call, ANDERSON told BRYANT that he had an out-of-town customer ("out the way-way") who would take approximately two kilograms of cocaine, that BRYANT indicated it would be around $55,000 ("55") and that he would check with his source of supply (HARDEN) to see when and hurry him up ("set a fire").

46.     At 8:14 a.m. on March 6, 2019, ANDERSON texted BRYANT: "Hit me dog." A few minutes later, at 8:18 a.m., ANDERSON called BRYANT. BRYANT said that he was still 30 minutes away so whenever ANDERSON wanted BRYANT could call "him" (*i.e.*, the source, HARDEN) to let the source known whatever time ANDERSON was "trying to do it" (*i.e*, obtain the cocaine), and when ANDERSON wanted BRYANT "to go get it."

47.     At 10:46 a.m., ANDERSON called BRYANT and asked if he was ready. They then agreed to meet "at the court." Shortly thereafter, agents observed BRYANT depart his residence on N Street and arrive at ANDERSON's known stash pad on Hamerbee Court in Sacramento. At 11:43 a.m., BRYANT called ANDERSON and said that he was outside, and ANDERSON told him to come to the door. Agents observed BRYANT walk to the front door carrying a bag and enter the house before leaving shortly thereafter. I believe that in the intercepted calls preceding this meeting, BRYANT agreed to come get the money from ANDERSON needed to go get the cocaine for ANDERSON who requested to meet at his drug storage location (stash pad). At 3:12 p.m., ANDERSON called BRYANT again, and BRYANT said he would come in a minute and would see real quick. At 3:52 p.m., BRYANT called ANDERSON and said he was outside at the door. Agents observed BRYANT arrive and enter ANDERSON's location on Hamerbee Court which I believe was BRYANT delivering the cocaine.

**March 7, 2019: HARDEN and BRYANT discuss the movement of cocaine from Mexico and outside California.**

48.     At 1:43 p.m. on March 7, 2019, HARDEN called BRYANT. BRYANT told HARDEN that he "got another thing to get over to your" because BRYANT had "just got it on." BRYANT said it was a "707 thing" and he was going to "hit" HARDEN. HARDEN said he was going to "do mine in a minute, too." I believe that this was BRYANT relating that he had obtained a new 707-area code telephone that he was going to convey the number to HARDEN and HARDEN

15

responding that he was about to change his number as well.  Later in the conversation, HARDEN asked how they were looking on "the other thing." BRYANT said it was like he had told HARDEN they were trying to go "to the bird."  BRYANT said he (possibly a third party) was trying to "get the route together, make a more solid route."  BRYANT asked if HARDEN remembered when they "took the highway too?  When they missed the other shit and a couple of other routes?  I just got a ride that was supposed to be on the way down to the people so they could put it together?"  HARDEN said he remembered, and BRYANT told him that he had been telling them about that. I note that BRYANT and HARDEN had previously been stopped in a vehicle in Texas in the early 2000s with over $350,000.00 U.S.C. I believe based on my training and experience and knowledge of this investigation, that in this conversation, BRYANT and HARDEN discussed the transportation of drugs to customers out of state and about possibly traveling to Phoenix, Arizona ("The Bird").

49.     In this same call, HARDEN said, "I thought the people were going to start coming?"  BRYANT said "Yeah, he was still working on them and they were tripping behind they tried to come but all that Trump thing was happening but they been trying to put something together so they wouldn't have no problems . . . apparently that was a big issue for the person that was driving . . . the main driver . . . hopefully it will be in a minute."  BRYANT said it was the main person who was doing that type of shit that got taken.  BRYANT said hopefully it would be any minute.  HARDEN agreed it was about "transportation." I believe that in this part of the conversation, BRYANT was discussing sources he knew who were attempting to transport drugs from Mexico into the United Stated and that they were having difficulties due to the border restrictions ("Trump thing") getting drugs across into the United States.

50.     In this same call, HARDEN said, "I was trying, between my shit and the little shit I gave you."  HARDEN said he was working over there picking it up in Elk Grove and "my boy is out and ain't not going to have anything until the next few days.  But it's going to start heating up in about a week or two."  BRYANT agreed and said it was going to warm up and they would be moving in a minute. BRYANT said he knew they were going to go to "the bird . . . just waiting for the little shit to get through and it was all supposed to get straight."  BRYANT said he was going to call HARDEN and that it was going to be a 707 number.  I believe this conversation was HARDEN informing BRYANT that his own source of supply ("my boy") was not going to have additional kilograms of cocaine for a few days but that availability would improve in a few weeks. I believe BRYANT was also echoing that they would be able to go to Phoenix soon to obtain drugs as well once they crossed the border and reiterating that he would contact HARDEN with his new 707 area code telephone.

/ / /

/ / /

**March 13-20, 2019: BRYANT continues to obtain cocaine from HARDEN for his customers**

51.    On March 13, 2019, ANDERSON called BRYANT and asked, "you have like four bands of that?" to which BRYANT responded, "I got like like 1500." ANDERSON said he needed "to make something happen before I get up out of here." ANDERSON said, "my shit about to be gone, I was trying to get another one before I left." BRYANT said he was trying to "get with them" to which ANDERSON said "15?) and BRYANT affirmed, and ANDERSON said he would get with him because he wanted to "take it with me when I leave." I believe based on my training and experience and analysis of prior calls between ANDERSON and BRYANT that ANDERSON was requesting another kilogram of cocaine ("another one").  BRYANT said he would "get with them" but that he "didn't know when they would be ready," meaning that he would check with his source(s) to see if they had the cocaine ready.

52.    That same day, BRYANT was intercepted receiving calls from drug customers Dwight HANEY and Charles CARTER, further explained below, who both requested cocaine and/or cocaine base ("soft" and "hard"), between 2:00 p.m. and 5:00 p.m.  HANEY said he needed "one or one and a half," and CARTER stated he had "17 or 18" to give BRYANT for "the next one."  BRYANT told HANEY and CARTER that he was still waiting for the drugs, but that he hoped to have them shortly.  I believe HANEY was requesting one or one and a half "nine packs" (*i.e.*, quarter kilograms of cocaine or cocaine base) and that CARTER had enough money for a half-kilogram ("17 or 18" equating to $17,000 to $18,000).

53.    At 7:00 p.m. on March 13, 2019, I observed BRYANT's vehicle and HARDEN's vehicle parked in front of the IHOP where I had previously observed them meet and conduct exchanges.  BRYANT's vehicle was registered to him, and HARDEN's vehicle was registered to his wife Luckrisa Jones.  I had also previously seen BRYANT and HARDEN in these same respective vehicles in the past.  I believe based on my training and experience and knowledge of the investigation that that this was another drug-related meeting to transfer drugs or drug proceeds and to plan upcoming transactions as agents had previously observed in February.

54.    BRYANT attempted to call CARTER at 7:35 p.m., during the approximate time BRYANT was meeting with HARDEN at the IHOP.  I believe based on the timing and the prior drug-related conversations that BRYANT was attempting to alert CARTER that he had obtained the drugs from HARDEN.  I also believe that based upon subsequent intercepted calls between BRYANT and CARTER at 9:07 p.m. and BRYANT and HANEY at 9:25 p.m., during which BRYANT arranged to meet them, that BRYANT was arranging to deliver the drugs he had just obtained from HARDEN.

55. On March 16, 2019, at 9:30 a.m. and 11:00 a.m., ANDERSON called BRYANT and said that he was "ready." BRYANT responded he was calling his "boy" and was "waiting on a call back." The pen register on HARDEN's telephone showed that BRYANT called HARDEN multiple times from his new separate 707 area-code telephone after these calls between ANDERSON and BRYANT, including at 9:58 a.m. and 11:02 a.m. Over the next two hours, BRYANT attempted to call HARDEN unsuccessfully approximately 20 times from this same 707-area code telephone before finally apparently having a connected minutes-long call at that time per the pen register. Following the call between BRYANT and HARDEN on the 707-area code telephone, BRYANT contacted ANDERSON from TT#2 and made arrangements to meet him to pick up the money to purchase a kilogram of cocaine. ANDERSON said he was "in the court" and BRYANT said he was "going to go your way." Based upon subsequent calls and BRYANT's conversations with HARDEN, I believe that they met and BRYANT did in fact take ANDERSON's money to obtain a kilogram of cocaine for him.

56. Following this exchange, between approximately 3:00 p.m. and 7:00 p.m., BRYANT's 707-area code telephone contacted HARDEN several times by text message. During this time, BRYANT also sent ANDERSON a text messages from TARGET TELEPHONE 2 at 6:34 p.m.: "Out here waiting dog hit you in min." BRYANT's 707-area code telephone continued to make repeated attempted calls to HARDEN throughout the rest of the day before finally making contact with HARDEN late in the evening. Following this call between HARDEN and BRYANT's 707-area-code telephone, BRYANT was intercepted telling ANDERSON at 8:35 p.m. that he was going to have to return his money. I believe that this series of calls illustrated that BRYANT had obtained ANDERSON's money with the intent of obtaining the cocaine from HARDEN, as evidenced by the high-frequency contact per the pen registers between HARDEN and BRYANT's new phone during this time period, but that HARDEN was unable to do so and BRYANT therefore returned ANDERSON's money.

57. On March 17, 2019, BRYANT used TARGET TELEPHONE 2 to text Bobby CONNER: "Bro Trippin" and "Said no good." He also texted ANDERSON, "it's no good." HARDEN's phone had contact with BRYANT's 707-area code telephone shortly thereafter. At 9:08 p.m., BRYANT used TARGET TELEPHONE 2 to send a text to ANDERSON: "Dog we all bad." I believe this series of calls and texts was BRYANT speaking to HARDEN and subsequently relaying to ANDERSON and CONNER that the cocaine was not yet available.

58. On March 20, 2019, the last day of interception of TARGET TELEPHONE 2, ANDERSON was intercepted calling BRYANT. During this call, ANDERSON stated he was "waiting for some change to come in" and asking BRYANT if "it's good?" BRYANT stated he had "not talked to him" but that "the people couldn't get in the house." ANDERSON indicated he had thought "the people never came," and BRYANT responded that "the people came but they had to handle some other shit first." BRYANT stated that his friend was "cool" but that that

they had to "work with his nephew" on "the little shit" until "it" got there, which he anticipated would happen soon.  I believe that this call was ANDERSON expressing the fact that he had received some drug proceeds, and he was asking when additional cocaine would be available.  BRYANT then explained that he had not talked to HARDEN, but that he had been informed that couriers had difficulty getting into the country (or area) ("the people couldn't get in the house") and, when they finally did get in, they had to supply other customers first ("the people came but they had to handle some other shit first.")  I believe this was why they were forced to "work with his nephew" to obtain and distribute smaller amounts ("the little shit") until "it" (*i.e.*, the larger amount) arrived, as they anticipated it would.

**Jerome ADAMS identified as BRYANT's partner in distributing cocaine, cocaine base, and heroin**

59.    Based on the below intercepts, I believe that Jerome ADAMS partnered with BRYANT in the distribution of large quantities of cocaine, cocaine base, and heroin.  ADAMS was one of BRYANT's highest-frequently-contacted customers and partners.  ADAMS has an extensive criminal history including three separate felony convictions for Possession of Cocaine Base for Sale in California.  BRYANT and ADAMS regularly discussed how much drugs – cocaine, cocaine base, and heroin – they had been able to distribute on any given day and the state of their drug dealing enterprise.   BRYANT and ADAMS regularly discussed drug distribution strategy, including what to do when one of their customers was arrested during the course of the intercepts.  During and prior to the July and August 2018 intercepts of ANDERSON, surveillance agents observed ADAMS driving BRYANT to pick up cocaine before BRYANT delivered the cocaine to ANDERSON.  ADAMS was identified by agents from his DMV photograph.

60.    On February 22, 2019, at 8:12 a.m., BRYANT called Jerome ADAMS (at 916-329-2179 previously self-provided by ADAMS and subscribed to ADAMS) and told him he had tried calling him the previous evening and had "60-70 pops for you" (60-70 bags of drugs).  ADAMS related that he had "fucked up…I forgot I had the old man . . . he would buy an ounce a week" of "that black shit you had." BRYANT responded, "that shit is strong as hell."  ADAMS said that people started complaining about it and that he (ADAMS) had gone through half a bag.  I believe based on my training and experience that in this conversation, BRYANT told ADAMS that he had an amount of crack cocaine ("pops" a common slang for cocaine base rocks packaged for sale) for ADAMS and ADAMS responded that he had a customer for ounce quantities of heroin ("that black shit") that BRYANT had which ADAMS had been selling.

61.    On February 23, 2019, at 2:45 p.m., BRYANT called ADAMS.  ADAMS asked if a third party had contacted him, and BRYANT stated he had not.  ADAMS related that this person wanted to get an amount of "hard," which is common slang for cocaine base.  ADAMS related that he had told the third party he would

talk to BRYANT and then contact the third party back and let him know if it was available.

62. On February 24, 2019, at 8:53 p.m., BRYANT called ADAMS and said that things were slow.  ADAMS said he was hitting everyone he knew to see if they wanted anything and that some customers wanted the drugs "on credit," but ADAMS said no.  BRYANT said he was only getting "Kibbles and Bits" (*i.e.*, small amounts of drugs and money) ADAMS said he only had one or two calls all day.  BRYANT agreed to stop by.

63. On March 1, 2019, at 4:01 p.m., BRYANT called ADAMS.  BRYANT inquired if ADAMS had spoken to the girlfriend of James McCurin.  As explained below, McCurin was intercepted arranging to purchase a large amount of cocaine from BRYANT on February 27, 2019.  After he was observed meeting with BRYANT at BRYANT's residence on this day, receiving a bag from BRYANT, and driving away, McCurin was stopped by the California Highway Patrol (CHP) and found to be in possession of 200 grams of cocaine.  McCurin was arrested and in custody at the time of this call with ADAMS.

64. During the call on March 1, 2019, ADAMS said McCurin's girlfriend must be downtown at the court and had not gotten back to him and might be visiting McCurin.  BRYANT said they had all these new laws about drugs and that it was not like it used to be.  ADAMS echoed that it was nowhere near as bad.  ADAMS said that a lot of non-violent offenders were getting out, and BRYANT said Obama changed all the non-violent laws and that hopefully McCurin would get out.  During a subsequent call with ADAMS at 5:23 p.m., they again discussed McCurin's situation, and ADAMS expressed his belief that law enforcement might have "snatched him up on petty weak stuff and went overboard with the bullshit" and maybe McCurin would get lucky.  BRYANT said he was concerned that he did not know how much McCurin got grabbed with (as he had no indication of when, where, or how McCurin was arrested), which was why he needed ADAMS to talk to the girlfriend.  BRYANT told ADAMS that he was aware that she had been the one doing most of the "running" (*i.e.*, distributing the drugs).  BRYANT said he needed ADAMS to find out if customers had been dealing directly with the girlfriend or went through McCurin so they could find out "what their program was" because BRYANT wanted to "get my hands on some of that change that was coming in" (*i.e.*, he wanted to continue to realize the money from the sales of the narcotics McCurin had been distributing).  BRYANT said they should wait a couple weeks for things to calm down but then he wanted ADAMS to speak to the girlfriend about whether the customers had her number as well and if business would continue.  ADAMS concurred.

65. At 7:27 p.m. on March 1, 2019, ADAMS called BRYANT and asked if BRYANT could "throw together 150" and BRYANT said, "all right, I'll do that real quick and be there." I believe this was ADAMS requesting an amount of

20

cocaine/cocaine base, 150 grams or 150 rocks (usually smaller than a gram), and BRYANT agreeing to package and deliver it immediately.

66.     On March 2, 2019, at 1:07 p.m., ADAMS called BRYANT.  They again talked about McCurin's girlfriend.  BRYANT told ADAMS he needed to go talk to her in person to "find out how much she had left" and to tell here to "send those people their way."  At 2:20 p.m., ADAMS called BRYANT and indicated he had talked to McCurin's girl and she could "do 2 or 3 at a time" and could "shoot some people our way" and that BRYANT probably already knew a few of them. BRYANT told ADAMS he did not want to talk to her until McCurin said it was okay and straightened it out with her.  I believe that these conversations were ADAMS relating that McCurin's girlfriend could continue his drug dealing for him and that she could also refer larger customers to ADAMS and BRYANT.

67.     On March 5, 2019, at 11:39 a.m., BRYANT and ADAMS again discussed McCurin's arrest and McCuri's  girlfriend's ability to distribute the drugs that McCurin was distributing prior to his arrest.  BRYANT said he had to "get some of that bread that they are trying to spend" and McCurin related that he had "just hollered at her yesterday . . . but she said she wanted to wait."  BRYANT then said he already knew that she was "doing it" because he (third party) had told BRYANT and she "had to make a living" and he knew "that they were already calling her every two or three days" but "if she ain't got it, she ain't got it, but she can pass them onto someone else."  ADAMS said that she was "going to do like James [McCurin] had said" and that she would call ADAMS whenever she needed anything.  BRYANT repeated that "that shit happened on a fluke" and the CHP stopped him and ran his plates and everything came up.  BRYANT said that "the longer she takes the others would go somewhere else."  I believe this was a discussion as to whether McCurin's girlfriend would continue his trafficking while supplied by ADAMS and BRYANT or whether she would pass the customers on.

68.     On March 6, 2019, at 10:17 a.m., BRYANT called ADAMS and said that he was "taking it to the old folks" and was "finishing it for him."  At 11:40 a.m., following the call with ADAMS, surveillance agents observed BRYANT arriving at ANDERSON's location at 7308 Hamerbee Court for what I believe to be a drug transaction.  I believe that in the call between BRYANT and ADAMS, BRYANT told ADAMS that he was in the process of converting cocaine into cocaine base for his longtime customer, ANDERSON.

69.     At 2:54 p.m. that same day, ADAMS called BRYANT, who told ADAMS it was "fucked today" and that it was "slower than usual" and that he was "trying to get a few more people to pick up the slack that old boy Six (McCurin's nickname per prior intercepts) was springing."  BRYANT said, "it's hard to find any youngsters who are really trying to hustle" and ADAMS concurred and said like McCurin had been doing.  ADAMS said he was going to keep trying to "see what we can make happen and would keep plucking around."

70.    On March 8, 2019, at 10:25 a.m., BRYANT called ADAMS.  During this conversation, ADAMS said "the guy I got out there in the Heights is cool" but that "I need me at least three or four more."  BRYANT asked if ADAMS had talked to McCurin's girlfriend, and ADAMS said no.  BRYANT said they could not wait for her and had to "keep flowing while you can, she ain't got to do shit." ADAMS said she might be trying to run off.  BRYANT said they had to "hit her for the same number and get her her's up off of it . . . to keep the clientele moving." ADAMS said he believed she was going to be calling him that day. BRYANT responded, "they usually hit every two or three days."  ADAMS said he could "put some shit together . . . get my hands in some shit . . . I got folks over there . . . but I don't trust the police over there not to work that little spot." BRYANT said that "the Arcade is hot because that is where everyone is in the morning."  I believe that this call was BRYANT and ADAMS discussing the fact they needed more customers and the potential arrangement with McCurin's girlfriend to keep distributing cocaine and cocaine base and their willingness to keep the prices for the drugs the same to encourage the continued patronage of her and McCurin's drug customers.

71.    During subsequent calls with ADAMS and BRYANT, I believe based on my training and experience and knowledge of the investigation that BRYAN directed ADAMS to deliver cocaine or cocaine base to a particular customer when BRYANT was not available and to go and pick up an apparent firearm and ammunition on BRYANT's behalf, both of which ADAMS apparently did based upon the calls.

       **BRYANT intercepted supplying cocaine base and heroin to Charles CARTER, discussing new powder cocaine source of supply, and discussing the robbery of a heroin source of supply.**

72.    Beginning on February 22, 2019 and continuing through March 19, 2019, BRYANT was intercepted engaging in a series of drug related text and telephone communications with an individual identified as Charles CARTER.  CARTER has an extensive criminal history including prior felony convictions for Possession of a Controlled Substance, Felony Evading, and Possession of a Loaded Firearm in Public. CARTER was arrested in 2018 for multiple charges including Possession of Cocaine Base for Sale and was subsequently convicted of his second offense for Felony Evading/Disregard Safety and is currently on felony probation.  I believe based upon the below-described intercepts that BRYANT was fronting CARTER cocaine base for distribution; that CARTER was obtaining tar heroin from multiple sources on behalf of BRYANT; that CARTER was "middle-manning" multiple kilogram cocaine transactions for BRYANT whenever CARTER found a source with an exceptional kilo price; and that CARTER was planning on robbing a source of supply for multiple kilograms of heroin.

73.     On February 22, 2019, BRYANT sent multiple text messages to 279-200-4444 saying, "Hit me."  This telephone was provided in 2018 by Charles CARTER as his contact telephone to multiple sources including to Sacramento County Probation.  At 6:25 p.m., CARTER called BRYANT, who asked CARTER if their "boy" had gotten "any more of that dirt."  CARTER indicated he believed so, and BRYANT asked if it was "the cheap" or "the same one."  CARTER stated he had not talked to the third party in a couple of days.  BRYANT said his boy had got some for "7-50."  CARTER said he would let BRYANT know by the end of the night "about the money."  BRYANT said this was cool and to let him know what was up.  I believe that in this conversation, BRYANT asked CARTER whether a third party had obtained any more heroin ("dirt" or "black" being common slang for tar heroin) and CARTER affirmed that he had.  BRYANT then inquired if the heroin was less expensive or the same price ("the cheap" or "the same one") and indicated that he had an acquaintance who had been obtaining ounces for $750 ("7-50"), which is consistent for the then-current price for tar heroin.  CARTER then told BRYANT that he would advise him shortly "about the money" he owed BRYANT.

74.     On February 25, 2019, at 9:22 a.m., BRYANT sent a text to CARTER: "Hit me dog a s a p."  At 11:29 a.m., CARTER called BRYANT and told him he had just gotten a new phone because the other one broke.  BRYANT said he "was trying to grab that shit because my boy is supposed to be on his way at three o'clock."  CARTER said he would be at his house working on his truck, and BRYANT related he would "be there in 45 minutes to one hour . . . dudes going to be on his way at three." CARTER stated, "I got eleven for you right now."  At 2:11 p.m., BRYANT called CARTER and told him he was pulling up outside.  As this was occurring, agents followed BRYANT to CARTER's listed probation and DMV address in Sacramento and observed and photographed CARTER come out of his apartment and enter BRYANT's vehicle parked out front for a brief time before exiting and returning directly to his apartment.  I believe that in the text message and calls preceding this surveillance, BRYANT told CARTER he wanted to pick up the drug proceeds because he was going to be seeing his drug source.  CARTER then agreed to give him an amount of money he owed him, either $1,100 or $11,000, and that transaction did in fact occur when they met in person.

75.     On March 1, 2019, at 5:43 p.m., BRYANT called CARTER.  CARTER said he was in San Francisco until at least the following day.  BRYANT asked CARTER if he still needed or wanted "that," and CARTER said he definitely did. BRYANT then asked what CARTER needed.  BRYANT said it was either going to be "7 or 72."  CARTER said that was good and that when he got back the next day, he would call BRYANT.  I believe, based upon the context of this call and subsequent calls that in this conversation, BRYANT asked CARTER if he needed more drugs, and CARTER said he did, and asked how much money he owed BRYANT.

76.     On March 3, 2019, at 7:33 p.m., BRYANT sent CARTER a text: "Hit me dog."
        At 7:46 p.m., CARTER called BRYANT and said that he was "going to the bank
        tomorrow" and that he would "have my girl go to the bank tomorrow" as he was
        "trying to put that shit together . . . I'm out here in the streets" but that he was in
        the city and would be back tomorrow.  BRYANT told CARTER to call him when
        he got back.  I believe that in this call, CARTER told BRYANT he was going to
        collect the money (go to the "bank") he owed BRYANT for additional drugs they
        discussed earlier and that he was "out in the streets" selling drugs to have the
        money for BRYANT.

77.     On March 4, 2019, at 5:20 p.m., CARTER called BRYANT and asked if
        BRYANT wanted to "bring me like six?" BRYANT asked, "Where we at on the
        other thing?" to which CARTER responded, "I got you on that, don't even worry,
        I'll have seven." BRYANT asked, "Bring you what?" and CARTER said, "Bring
        me six of them . . . let me know how much you want for them."  BRYANT said
        he would call CARTER back in about 20 minutes.  At 6:01 p.m., BRYANT sent
        CARTER a text: "825 for 6 4950," to which CARTER immediately responded:
        "Ok."  BRYANT texted: "On my way."  As explained in detail below, I believe
        based upon the price quoted per unit ($825 being consistent with cocaine base as
        opposed to cocaine which priced higher) that CARTER was requesting six ounces
        of cocaine base (approximately 170 grams).

78.     At 7:31 p.m. that day, BRYANT received a call from CARTER and told him he
        was "just now walking out the door because I had to do something real quick."
        CARTER asked BRYANT, "you don't want to give me the whole nina? I was
        going to grab some skittles, but, you know what I mean?"  BRYANT asked, "You
        got all that other?"  CARTER responded, "I got your forty-nine fifty right here . . .
        I still got to collect that other, you feel me? It's good . . . I just didn't want to hang
        onto this chicken, you feel . . . but soon as I finished collecting yours it's right off
        the top." BRYANT said he needed that.  BRYANT said he would be there in a
        minute.  Based on my training and experience and analysis of previous calls, I
        believe that CARTER owed BRYANT money, approximately $7000, for
        narcotics earlier provided, and that BRYANT was delivering six ounces of crack
        cocaine for $825 per ounce for a price of $4950 but that CARTER did not have all
        the money for the total amount he already owed BRYANT and for the cocaine
        base BRYANT was delivering.  I also believe that CARTER was conveying that
        since he was not getting the MDMA ("skittles") he had additional money to get a
        full nine pack or nine ounces ("nina") of cocaine base.  I know based on my
        training and experience that nine ounces is a common distribution unit of
        measurement for cocaine and cocaine base.  I also believe that based on the above
        calls, BRYANT did not want to give CARTER the full nine ounces but would
        instead give him the six ounces for which CARTER had the money.

79.     On March 7, 2019, at 6:03 a.m., CARTER sent BRYANT a text: "U up."
        BRYANT responded, "W up."  CARTER then texted: "Everybody asleep I got yo
        18 pull up."  At 7:04 a.m., BRYANT responded: "Hit me."  At 8:57 a,m,

24

BRYANT called CARTER and said he was about to pull up. I believe this exchange was CARTER telling BRYANT he had a portion of the narcotics proceeds ($1,800 or $18,000) he owed BRYANT and then making arrangements for BRYANT to pick it up.

80.     On March 13, 2019, at 8:30 p.m., CARTER called BRYANT.  BRYANT asked CARTER "what are you holding?"  CARTER told BRYANT he had been out of town but was back and "put together 17, like 18 with the shoes and shit" and asked BRYANT if he wanted to meet him.  BRYANT said that they could meet in less than an hour. They later agreed to meet at a fast-food restaurant in Sacramento.  I believe that in this call, CARTER again arranged a drug-related transaction with BRYANT ("17" or "18") and that the term "shoes" was unknown drug-related code.  I know that $17,000 to $18,000 would be an appropriate price for a half kilogram of cocaine powder.

81.     On March 14, 2019, at 9:44 a.m., BRYANT called CARTER.  CARTER told BRYANT "he is supposed to bring them by today" and BRYANT responded "I will make a couple of calls. Put that together." CARTER said, "Numbers like crazy right now, if you can get them twenty-five and under, shit."  BRYANT said he was in for "one," and CARTER said, "like 25."  BRYANT asked if they were good, and CARTER responded, "They are, with a number like 25 or under, people would be telling him to get more." BRYANT said, "I just got four the other day for someone" and "I got them for 27 a piece the other day, that was for four of them, and one of them wanted 28." CARTER said he could "hook it up today . . . I only put a band on them . . . it's here already." BRYANT said, "I am sure the numbers are like that, you just need a good plug." BRYANT said he needed "sixes and sevens" and CARTER asked, "How many" and BRYANT responded "Two pairs. Two sixes and two sevens. Two of the same, two of the same, four altogether." I believe based on my training and experience and analysis of prior and subsequent calls between BRYANT and CARTER that in this call, CARTER said that he had access to another source for kilograms of cocaine for prices between $24,500 and $25,000 per kilogram depending on how many kilograms were purchased.  BRYANT responded that he wanted at least one kilogram, and CARTER confirmed it would be $25,000.  BRYANT the related that he had recently purchased four kilograms at $27,000 each and the source had wanted $28,000 per individual kilogram.  CARTER responded he could provide this cocaine immediately.

82.     On March 16, 2019, at 4:24 p.m., CARTER called BRYANT. During this call, CARTER told BRYANT "I need a new spot" and that he was going to "do the walk away . . . sting the nigger . . . I told you, I'm taking that" like they had previously discussed.  BRYANT asked, "What they got?" and CARTER said "I'm going to order 3 dark ones."  BRYANT asked "the whole pieces? The whole things?" and CARTER affirmed.  BRYANT asked, "They don't know where your spot is at?" and CARTER responded, "That's why I need to get a new spot." CARTER confirmed that they did and that he was going to have to move but he

did not care; "I'll empty everything out of the bedrooms and leave the living room just like it is, couches and shit . . . I'll be like 'I'll be right back.' My word is gravy, I could order like four of them, no problem. I told him blame it on me. I won't have no problem over seventy thousand . . . I been hearing all this bullshit for years 'they cartel,' whatever. I have done shit for less . . . ." CARTER said he wanted to "knock this guy . . . I just want to knock them..I want to knock them for at least twenty-five . . . I'm going to take that . . . and he was telling me they the ones . . . I just want to take them, it'll be easy." CARTER also said, "I will do whatever I have to if there is a problem."   Based on my training and experience, I believe that during this call, CARTER discussed his intent to rob a separate source of supply of three kilograms of heroin ("going to order 3 dark ones"). BRYANT then confirmed that CARTER was talking about kilograms and wondered if the people CARTER was going to rob knew where CARTER lived. CARTER said that they did and that he would just move because he would be taking kilograms at $25,000 each.

**BRYANT has multiple ounce cocaine, cocaine base and heroin customers meet him at his then-residence at 541 N Street, Rio Linda, California and his then and current stash pad at 450 Greg Thatch Circle, Sacramento, California to pick up drugs including cocaine subsequently seized from James McCurin**

83.   Immediately after initiating intercepts of BRYANT in late February 2019, it became apparent that BRYANT was supplying multiple individuals with large amounts of cocaine, cocaine base, and heroin.  Through intercepts and subsequent surveillance, agents established that BRYANT would have certain customers meet him at his then-residence at 541 N Street, Rio Linda, California (including Mark MARTIN and James McCurin) and/or his second residence and stash pad located at 450 Greg Thatch Circle, Sacramento, California (including Bobby CONNER). BRYANT would also deliver drugs to some customers, including Arlington CAINE.

**James McCurin arrested with seven ounces cocaine sourced by BRYANT**

84.   Prior to interception of BRYANT, BRYANT's telephone, TARGET TELEPHONE 2, was in regular contact with a cellular telephone listed to James McCurin.  McCurin has a significant criminal history including prior state felony convictions for Possession of a Controlled Substance, Spousal Abuse, and Robbery, and a 2006 federal drug conviction for Possession of Cocaine Base with Intent to Distribute.

85.   On February 25, 2019, at 9:48 a.m., McCurin called BRYANT and said "I am at the postal, where you at?" to which BRYANT related he was "at the house back here . . . me something to eat here at the spot . . . the house back here." McCurin responded that "I'm going into the Post Office, I'll call you when I come out of there." Just prior to this, surveillance agents observed BRYANT arrive in his car

at his residence at 541 N Street, park in the driveway, and remove a large bag from the trunk. BRYANT looked around several times, up and down the block, before removing the bag and carrying it inside. At 10:02 a.m., McCurin called BRYANT and told BRYANT "Hey I'm outside, I got the money on me . . . but I got (unitelligeble) with me too." BRYANT said "Well, I was in the middle . . . it's up to you man." McCurin stated "I'm fixing to come that way . . . come to the front."

86.     Shortly thereafter, surveillance agents observed McCurin arrive in a 2017 silver Nissan Titan truck registered in his name. BRYANT then came outside the residence carrying a small package and walked to the driver's side of McCurin's vehicle where he was observed handing the package to McCurin before McCurin drove away. McCurin was identified by his DMV photograph. I believe based on my training and experience and subsequent seizure from McCurin, that this was a drug deal during which BRYANT gave McCurin a package containing the drugs.

87.     On February 27, 2019, McCurin and BRYANT engaged in several calls during which they discussed money and meeting later. At 2:05 p.m., McCurin called BRYANT and asked, "where you at?" and BRYANT responded, "I am about to go get it ready." McCurin told him "Go get it ready." BRYANT said, "I am about to go grab it and then go to my spot and get it ready." At 3:50 p.m., BRYANT called McCurin and said "I'm back here in the back . . . I'm ready." McCurin said he would be on his way in about 30 minutes and BRYANT responded, "You said seven right?" McCurin said yes. At 4:28 p.m., McCurin called and said, "I'm here!" At this same time, agents observed McCurin arrive at the residence at 541 N Street in Rio Linda in his Nissan Titan truck, at which time BRYANT exited the residence carrying a large paper bag. BRYANT walked to the passenger side of McCurin' vehicle, entered and quickly exited, now no longer carrying the bag. McCurin then pulled away.

88.     After McCurin drove away from the residence, he was contacted by the CHP for a vehicle code violation. During this contact, officers searched McCurin's vehicle and located a brown paper bag similar to the one BRYANT gave McCurin and found it to contain a large amount of solid cocaine. McCurin was arrested for Possession of Cocaine Base for Sale and subsequently convicted of violating the terms of his federal supervised release and sentenced to 25 months in federal prison. The DEA Western Regional Laboratory subsequently analyzed the substance seized from McCurin as being 200 grams of cocaine.

89.     On March 3, 2019, at 12:12 p.m., HARDEN called BRYANT and said that he had just heard that McCurin, had been "snatched up" and wanted to know if BRYANT had heard anything about it. BRYANT said everything was fine and that McCurin had been caught with "a couple of things" and had a hold. BRYANT assured HARDEN that it had been the CHP that had stopped McCurin and that they had not "gone to his spots." HARDEN said that if law enforcement had not gone to McCurin's house, it was not part of an investigation. HARDEN

said he had not been aware that McCurin was "active" (*i.e.*, on supervision) but that HARDEN would "change my little thing anyway" (*i.e.*, change his phone number).

**BRYANT frequently sources large quantities of cocaine and cocaine base to Bobby CONNER**

90. Bobby CONNER was identified as one of BRYANT's regular, high-quantity cocaine base customers. CONNER has an extensive criminal history including a felony drug for sale conviction and a state prison commitment. Per the Sacramento County Sheriff's Department, he is also a validated member of the Oak Park Bloods.

91. On February 20, 2019, BRYANT exchanged repeated text messages with cellular telephone 916-330-9644, subscribed to Bobby CONNER. CONNER was identified by his DMV photo during surveillance on intervening days meeting with BRYANT. Most of the text messages on this day related to the coordination of a meeting between BRYANT and CONNOR. For example, CONNER texted BRYANT, "You Up" and "You Around." BRYANT responded, "Yeah I'm home," and CONNER replied, "Im come get that 30min." At 10:02 p.m., BRYANT called CONNER. CONNER said he was looking for BRYANT, and BRYANT said he was on his way to meet him. At 10:29 p.m., BRYANT contacted CONNER and said he was pulling up right then. I believe based on subsequent communications and surveillance that these conversations were CONNER arranging to obtain narcotics from BRYANT.

92. On February 23, 2019, at 12:29 p.m., CONNER called BRYANT and asked if he was at the house. BRYANT responded that he was at the other house off Del Paso. CONNER indicated he needed to see BRYANT, and BRYANT told him he was busy making "lunch" and would call him later so CONNER could "come though." At 1:09 p.m., CONNER called BRYANT and said, "I need one of 'em" and that "I got some people in the View." BRYANT said he was almost finished and gave CONNER directions to the house on Greg Thatch Circle. At 1:18 p.m., CONNER called BRYANT to say he was close by. BRYANT asked CONNER "You said you wanted the one or what?" and CONNER responded "The one." BRYANT agreed and then continued to give CONNER directions to the house. While this was happening, surveillance agents observed CONNER arrive in the area in a silver 2018 Ford Sedan registered in his name and park in front of **450 Greg Thatch Circle.** Agents observed BRYANT walk out to the curb and enter the vehicle through the passenger door briefly before CONNER was observed driving away. I believe based on my training and experience and analysis of prior and subsequent calls between BRYANT and CONNOR, that in these calls, CONNER requested to meet BRYANT to obtain cocaine base ("I need one of em") for his customers in the Meadowview ("the View") neighborhood of Sacramento, and that they then conducted this transaction. I believe BRYANT and CONNER were discussing cocaine base because BRYANT repeatedly and

over an extended period of time said he was getting ready and was almost done "making lunch," which I believe was code for converting cocaine into cocaine base. I also believe "the one" referred to a quarter kilogram ("a nina," a "nine") of cocaine base as this appeared to be a consistent unit of measure with BRYANT and his customers, including ANDERSON, CARTER, and CONNER.

93.     On February 26, 2019, at 5:30 p.m., CONNER called BRYANT and told him that he had some "change at the house" but not on him and that he could be home in a minute unless BRYANT wanted to come and get it for "some soft." BRYANT asked him what he wanted, and CONNER said a "half." BRYANT said to give him a minute because he was not at his house and that he would come that way. CONNER said he might as well get half and half. I believe based on my training and experience and analysis of prior and subsequent calls between BRYANT and CONNER that in this call, CONNER indicated he had some money ("change") for some cocaine ("soft") and that he wanted an amount ("a half") and that he might as well get cocaine and cocaine base ("half and half").

94.     On March 2, 2019, at 12:11 p.m., BRYANT received a text from CONNER: "He didn't hit me yet so one hardtime." Two minutes later, CONNER sent another text: "When for hard." I know from my training and experience that "hard" is code for crack cocaine. BRYANT responded at 12:30 p.m.: "1230 I'm off." At 12:33 p.m., CONNER called BRYANT, and BRYANT asked CONNER if CONNER wanted "that one for his boy," *i.e.*, customer. CONNER asked if BRYANT wanted him to come over, and BRYANT told him to go to the Jack in the Box in North Sacramento right then. Surveillance agents subsequently saw them meet at this location shortly after the conversation. At 4:04 p.m., BRYANT called CONNER again, and they had an extensive conversation about cars for sale. At the end of this conversation, BRYANT asked CONNER "Your boy hit you?" CONNER stated that "He ain't got the dough yet but he will call me when he do and I'll hit you." BRYANT stated he was ready whenever CONNER and his boy were.

95.     On March 3, 2019, at 7:51 a.m., CONNER sent BRYANT a text: "Same." At 8:14 p.m., BRYANT responded: "Where you at." CONNER responded, "Home." BRYANT immediately responded: "On my way." At 8:38 a.m., BRYANT called CONNER and said he was outside, and CONNER said all right. I believe CONNER's request for "same" was a reference to CONNER's previous and regular cocaine base order from BRYANT.

96.     On March 4, 2019, at 11:51 a.m., CONNER sent BRYANT a text: "1." BRYANT responded: "Ready at 2:30." BRYANT and CONNER continued to exchange text messages about their relative locations and at 12:54 p.m. BRYANT texted: "Can you come to the house." At 2:17 p.m., CONNER called BRYANT and said he would be back in the area in 20 minutes. At 3:54 p.m., CONNER called BRYANT who asked CONNER to come to BRYANT's house in approximately 20 minutes. Surveillance agents subsequently observed CONNER

arrive at BRYANT's residence on N Street in Rio Linda in his silver Chevrolet Impala and meet briefly with BRYANT in front of the residence. I believe, based on the text message request for "1," that CONNER went to BRYANT's house to pick up a quantity of cocaine base.

97.     On March 6, 2019, at 2:59 p.m., CONNER called BRYANT and told BRYANT "if you want it just give me one and a half for it." BRYANT asked, "one and half of the zips?" to which CONNER said "Yeah, the hard . . . that way I could fill the gap of what bought it for." At 6:52 p.m., BRYANT called CONNER and asked if he had a bill of sale, and CONNER said he did. BRYANT said he would be there in about 40 minutes and CONNER said it was all good. I believe that this exchange was CONNER offering to sell BRYANT a vehicle with the understanding that BRYANT would give him 1.5 ounces of cocaine base ("hard") to make up the difference of what he had paid for it. I know based on my training and experience that one and a half ounces of cocaine base would cost between $1200 and $1500.

98.     On March 8, 2019, at 4:44 p.m., BRYANT received a text from CONNER, "1 soft," and then, "about 2hr." At 4:50 p.m., CONNER called BRYANT and told him that "I don't have the money on me . . . he got the bread . . . he told me I got to come and get it . . . then get it from you." BRYANT said, "Tell him to meet you . . . you can meet him somewhere, get it real quick, then meet me." CONNER said it would be a couple of hours because of traffic and BRYANT said, "Just call me when you ready and we will take care of it then." At 5:29 p.m., CONNER called BRYANT and told him "I'm just going to have to go to my house and grab my own bread." BRYANT asked "You gonna grab it and come straight here?" and CONNER said yes. At 5:54 p.m., BRYANT called CONNER and asked, "Where you at?" and CONNER said "I'm on 5 passing Arena coming to you." BRYANT told him to get off at Del Paso and come all the way down to Norwood and meet him at the Round Table Pizza. I believe based on my training and experience and analysis of prior correspondence that CONNER requested a quarter kilogram of powder cocaine ("1 soft") from BRYANT and then arranged the transaction with BRYANT.

**BRYANT and Dwight HANEY conduct multiple cocaine base transactions and discuss the details of making and distributing cocaine base.**

99.     On February 23, 2019, at 5:50 p.m., BRYANT received a text message from a cellular telephone subscribed to Gwendolyn HANEY at 384 Delagua Way, Sacramento: "What up dog when you think." I verified that Gwendolyn HANEY is the 71-year old mother of Dwight HANEY who owns the residence where Dwight HANEY lives at 384 Delagua Way, Sacramento, California.

100.    BRYANT immediately responded to HANEY's text message, "Monday and Tuesday for sure," and then, "It's hard, got the kids all weekend." HANEY immediately texted back: "Yep." Based upon the context of these texts, combined

with subsequent calls and surveillance the following day during which HANEY was intercepted arranging for the purchase of a large amount of cocaine base, I believe the above text messages were HANEY inquiring into the availability of cocaine base and BRYANT assuring him he would be prepared to supply him shortly.

101.   On February 24, 2019, at 11:33 a.m., HANEY called BRYANT and asked, "You have the four and the half that my partner be getting? . . . . [L]ike the four and I get the half." BRYANT asked what time because he had to take his daughters somewhere, and HANEY stated, "He is ready." BRYANT asked, "He with you?" and HANEY said "He gonna be here at 12." BRYANT told HANEY "I am going to leave here and go there and do it real quick." I believe based on my training and experience and knowledge of the investigation that during these calls, HANEY requested to purchase an amount of cocaine base for both his customer and himself ("four for him and a half for me") and BRYANT agreed to deliver the drugs.

102.   Agents subsequently established surveillance at HANEY's known residence, and at 12:00 p.m. observed an individual identified as Kevin Burns arrive at the residence. Agents identified Burns from his DMV photograph and vehicle registration. Burns has an extensive criminal history, including multiple narcotics convictions. HANEY (identified by his DMV photograph) was observed and photographed coming out of his residence and getting into Burns' vehicle, driving around the block, and immediately getting dropped back off at his residence. At 12:08 p.m., BRYANT called HANEY, and HANEY said he now had the third party's money. BRYANT said he was on his way and would be there in a few minutes. At 12:28 p.m., BRYANT called HANEY and said he was pulling up. HANEY said he was outside waiting. At 12:35 p.m., BRYANT called HANEY and said he only gave BRYANT "three stacks." HANEY responded that it had been four and that one had been "a double stack." I believe based on these calls, the surveillance, and my training and experience that HANEY told BRYANT that he had obtained the money from Burns, BRYANT then dropped off the cocaine base, Burns then returned to pick up his portion of the cocaine base from HANEY, and then BRYANT and HANEY discussed whether the payment was short ("stacks" being common slang for money).

103.   At 7:24 p.m., BRYANT called HANEY and asked, "You think tomorrow or Tuesday . . . I am making sure to have this shit ready for you." HANEY said Tuesday (February 26, 2019) and "They was complaining." BRYANT said, "That was the same as that other yellow that you had before, remember, I cooked that down a little more." HANEY said they had come and showed it to him, and BRYANT responded, "That was like the first yellow I gave you when you said they want some more of that. I thought that was good but I probably got it crossed with them." HANEY said, "Thanks for that other one today," and BRYANT responded, "For sure." I believe based on my training and experience that during this call, BRYANT confirmed that HANEY wanted the additional cocaine base

31

and said that he would get it ready for him ahead of time (*i.e.*, would convert the cocaine into cocaine base ahead of time).  HANEY and BRYANT then discussed the quality of the cocaine base, which has a distinctive yellowish color, which HANEY indicated the customers had complained about.

104.   On February 26, 2019, BRYANT engaged in repeated calls with HANEY. During these calls, HANEY and BRYANT agreed to meet.  HANEY asked if BRYANT had the "white," and BRYANT responded that he had "cooked it good" for HANEY (*i.e.*, converted cocaine to cocaine base).

105.   On March 2, 2019, at 2:20 p.m., HANEY called BRYANT and said he would be at his mother's house in 20 minutes and had a third party's money.  BRYANT asked if HANEY was ready on the other thing, and HANEY stated he needed another day.  BRYANT said he would call him shortly.  At 2:58 p.m., BRYANT called HANEY, who said he was there, and BRYANT said he was on his way.  At 3:23 p.m., BRYANT called HANEY and said he was two minutes away. A couple of minutes later, DEA agents observed BRYANT arrive at HANEY's residence at 384 Delagua Way, Sacramento, California and park in front. HANEY came out to the vehicle briefly before returning to the residence, and BRYANT drove away in his red Kia.  I believe these calls were HANEY obtaining an amount of cocaine base for a customer whose money he had already obtained, BRYANT asking if HANEY wanted any cocaine base for his own sales, HANEY indicating he would be done selling his own in a day or so, and BRYANT subsequently showing up and delivering the drugs.

106.   On March 5, 2019, at 1:06 p.m., BRYANT sent a text to HANEY: "What you think today I go you 5." HANEY immediately responded: "Tomorrow for sure but maybe tonight late." Based upon prior intercepts and surveillance, I believe that in this text conversation, BRYANT offered to supply HANEY with an amount of additional cocaine base, most likely 5 ounces, and HANEY responding he would not need it until that evening or the following day.

107.   On March 8, 2019, at 3:55 p.m., HANEY called BRYANT, who asked HANEY "Hey, you get that dollar yet? And that (unintelligible)?" HANEY stated that he had and would call BRYANT when "I get out there."  I believe based on my training and experience and analysis of prior interceptsp that this was in reference to drug proceeds that HANEY owed BRYANT for previously-provided drugs and that HANEY had $1,000 or $10,000 (a dollar) as part of that debt that he would give BRYANT.  At 9:02 p.m., HANEY called BRYANT, who said, "I am about to pull up, I'm right here by the store," and HANEY said alright.

108.   On March 12, 2019, at 9:54 p.m., BRYANT called HANEY.  HANEY told BRYANT he would be taking off and would be gone for four days. HANEY said "What I am working on, what I am trying to do, is give you one and a half before I go. That's why I am up early now, out in the street, on my way out to the south, just moving around."  BRYANT said, "I am doing all that myself" and asked,

"What's up with your folks? He ain't ready yet?" HANEY said "He gonna be ready when I get back, you know I was already on that . . . I already know as soon as I leave he gonna call me…. . . down to a little. . . but as soon as I get back I know I am gonna be really busy. Call me late tonight see what's up, if I am doing what I said I was doing." I believe based on my training and experience and analysis of prior intercepts that this was a conversation about money HANEY owed BRYANT for drugs BRYANT fronted to him. HANEY said he would deliver money to BRYANT possibly obtain more drugs for a third party.

**BRYANT sources quarter kilograms of cocaine and cocaine base to Arlington CAINE on multiple occasions.**

109.   Arlington CAINE was in frequent contact with BRYANT during the interception of TARGET TELEPHONE 2. CAINE regularly texted BRYANT drug orders such as: "1 not ready" and "1 ready." BRYANT would respond in similar fashion with texts including: "We at 825 now" and "Pulling up outside." BRYANT was observed traveling regularly to CAINE's residence around the time of these text messages. Caine provided this address as his residence per multiple database checks. Vehicles registered to him were observed at the residence and agents observed him at the residence. I believe based on my training and experience and knowledge of this investigation that BRYANT was delivering multiple ounces of cocaine base ("ready") and cocaine ("not ready") to CAINE during the course of the interception.

110.   On February 23, 2019, between 7:56 p.m. and 9:13 p.m., BRYANT engaged in a series of text messages (detailed below) with telephone 916-893-9651 identified by multiple databases (bank account header records and phone detail records) as listed and used by Arlington CAINE. In these text messages, CAINE asked BRYANT, "You out here" and then texted, "1 not ready." BRYANT responded, "30min," and subsequently, "On my way." At 9:10 p.m., BRYANT texted: "Outside." During subsequent days, surveillance agents observed BRYANT meet with CAINE, who was positively identified from a DMV photograph, at CAINE's listed residence, in Rio Linda, California. CAINE was one of the few customers to whom BRYANT delivered drugs; most customers came to BRYANT to obtain drugs. Based upon my training and experience, the context surrounding these communications, and analysis of subsequent conversations (see below), I believe that these texts were CAINE requesting quarter kilograms ("1") of cocaine ("not ready") or cocaine base ("ready") and BRYANT subsequently delivering those drugs ("Outside").

111.   On March 1, 2019, at 12:52 p.m., BRYANT received a text message from CAINE, "You out here." BRYANT responded, "W up." CAINE texted, "1 not ready," and BRYANT responded, "10 min," and shortly thereafter, "Outside." I believe based upon previous and subsequent communications and surveillance that CAINE was requesting a quarter kilogram of powder cocaine ("not ready") and BRYANT was agreeing to deliver it to CAINE's residence.

112.   Later that same day, at 6:58 p.m., BRYANT received a text message from
CAINE, "You out here."  BRYANT immediately responded: "Im here but only
got hard until tomorrow."  At 7:05 p.m., CAINE responded, "Damn ok."  I
believe based on my training and experience that BRYANT told CAINE that he
only had cocaine base ("hard") available as opposed to powder cocaine ("soft").
At 7:09 p.m., BRYANT called HARDEN and asked, "Is it possible to get
something?" HARDEN asked, "What are we talking about?" and BRYANT said,
"A quick nip?" HARDEN said, "I'll call my folks and see."  BRYANT asked, "Is
it the same?" and HARDEN stated, "It should be, let me see." I believe this was
BRYANT requesting to obtain a quarter kilogram (a "nine pack," "nina" or "nip"
in this case) from HARDEN on behalf of CAINE.  Following the call with
HARDEN, at 7:11 p.m., BRYANT texted CAINE, "G me a min maybe good."
At 7:42 p.m., BRYANT called HARDEN and they discussed meeting.  HARDEN
said, "I have to go to Elk Grove to go get it because I don't even have it yet."
BRYANT said that was fine because "I got to call dude and see if he is ready."
Immediately after this call, with HARDEN, at 7:45 p.m., BRYANT texted
CAINE, "Is 10 pm ok."  CAINE responded, "Holla at me!"  Based upon my
training and experience and analysis of prior and subsequent intercepts, I believe
that CAINE's regular references to 1 ready and 1 not ready were in fact references
to quarter kilogram amounts of cocaine ("not ready") and cocaine base ("ready").

113.   On March 2, 2019, at 11:45 a.m., CAINE texted BRYANT, "What's the work
tbird?" BRYANT responded, "Waiting rt now how many." At 12:09 p.m.,
BRYANT texted CAINE, "1 hr how many."  CAINE responded, "Im waiting on
my folks to hit me ill let you know asap."  At 2:12 p.m., following the above
meeting with HARDEN, BRYANT texted CAINE, "You ready," and then at 3:42
p.m., "Whats up."  At 5:58 p.m., BRYANT texted CAINE, "You good."  At 5:59
p.m., CAINE responded, "1 not ready."  At 6:00 p.m., BRYANT responded, "15
min," and then at 6:18 p.m., "Outside."  I believe that this series of texts were the
follow up from the previous evening when CAINE requested a quarter kilogram
of powder cocaine from BRYANT.  BRYANT first met HARDEN and then
delivered the cocaine ("1 not ready") to CAINE.

114.   On March 6, 2019, at 3:44 p.m., CAINE texted BRYANT, "You out there."
BRYANT responded, "Highlands w up."  CAINE immediately responded, "1
hard."  BRYANT immediately responded, "?" and then, "Going to get it."
CAINE asked BRYANT, "You know how long," and BRYANT responded,
"20min."  At 4:06 p.m., BRYANT texted CAINE, "Outside."  I believe that in
this text chain, CAINE requested nine ounces or a quarter kilogram ("1") of
cocaine base ("hard"), and BRYANT then delivered the drugs to CAINE.

115.   On March 8, 2019, at 12:00 p.m., CAINE texted BRYANT "You buy me."
BRYANT responded, "Come from south what up."  CAINE immediately
responded, "1 not ready half ready," to which BRYANT responded "ok" and "30
min." At 1:19 p.m., BRYANT texted CAINE, "Outside."  I believe that in this

exchange, CAINE requested a quarter kilogram of cocaine base ("1 not ready") and an eighth kilogram powder cocaine ("half not ready"), and that BRYANT then delivered the cocaine and cocaine base to CAINE as observed repeatedly by surveillance during prior transactions.

**BRYANT regularly sources cocaine base to Mark MARTIN from his residence on N Street.**

116. I believe that MARTIN is a cocaine and cocaine base sub-dealer for BRYANT. MARTIN has an extensive criminal history over the past 40 years including numerous felony convictions and lengthy prison commitments for burglary, robbery, robbery with a firearm, false imprisonment, and multiple convictions for failure to register as a sex offender.

117. On February 22, 2019, at 1:40 p.m., BRYANT called a phone subscribed to Mark MARTIN. During this intercepted call, MARTIN asked BRYANT, "Are you going to be at the house around four?" to which BRYANT responded "Yeah. What's going on?" MARTIN stated, "I am done; I just want to come by and pick up some more." MARTIN went on to say he was "going to make a couple of runs and take care of some business" and then he would be by. I believe based on my training and experience and analysis of prior and subsequent communications that in this call, MARTIN informed BRYANT he was nearly done selling all the cocaine and/or cocaine base he had received from BRYANT, that he wanted to come to the stash house to obtain more, and that he was going to do some deliveries ("make some runs" being common slang for drug deliveries) and then come by to obtain this cocaine and/or cocaine base.

118. At 4:01 p.m., MARTIN called BRYANT and said he was on his way. Shortly thereafter, agents observed MARTIN arrive at 541 N Street in a blue Ford Expedition registered in his name with DMV and observed MARTIN (identified from a DMV driver's license photograph) exit the vehicle and meet with BRYANT, who led him into the residence. After a couple minutes, they walked out together, and MARTIN departed in the same vehicle. I believe that during this brief meeting, MARTIN obtained the cocaine and/or cocaine base as previously discussed with BRYANT.

119. On February 28, 2019, at 6:06 p.m., MARTIN called BRYANT and asked, "Hey, you going to be at your house around ten o'clock?" BRYANT responded that he would. MARTIN said, "I'm going to go get the rest of the money from a girl . . . I gave her some on credit . . . and her money won't come on her card until ten o'clock." BRYANT confirmed he would be at his house and MARTIN said he would bring the money at that time. Later that evening at 10:13 p.m., MARTIN called BRYANT and said he would be there shortly. After these calls, surveillance agents observed a vehicle previously identified as MARTIN's vehicle arrive at BRYANT's N Street address at which time I believe MARTIN gave BRYANT additional money in exchange for cocaine or cocaine base as discussed during the intercepts. I am aware from my training and experience that

the cocaine base trade revolves around the first of the month, as this is the time many of the sub-dealers and customers receive their benefits (Social Security, EBT, FICA, etc.), and it has been my experience that this is the time when most cocaine base sub-dealers receive their funds from their customers.  I believe that MARTIN's statement that he "gave her some on credit" is consistent with this practice.

120.   On March 5, 2019, at 2:27 p.m., BRYANT received a call from MARTIN, who asked, "Can I come over" and BRYANT said yes, to which MARTIN said he would be there in five minutes. Within a few minutes, MARTIN called BRYANT and told him "Open the garage door." Per the surveillance camera at 541 N Street, Rio Linda, California, agents observed MARTIN arrive in his blue Ford Expedition, park in front of the residence, and walk up the driveway and enter the garage after the door opened and immediately closed behind him.  MARTIN left shortly thereafter and appeared to be carrying something in his hand that he did not have when he arrived.  I believe that MARTIN and BRYANT engaged in a drug transaction during this short meeting.

121.   On March 8 and 15, 2019, MARTIN and BRYANT arranged to meet and were observed meeting in similar fashion for suspected drug deals.  On March 8, BRYANT and MARTIN engaged in numerous calls wherein BRYANT directed MARTIN to a location where BRYANT was meeting another intercepted customer to deliver drugs at precisely the same time.  On March 15,  MARTIN called BRYANT numerous times to arrange to come by BRYANT's Rio Linda residence for a meeting which was identical to the drug deals observed between BRYANT and McCurin and CONNER and MARTIN, *i.e.*, MARTIN would place a call, arrange to meet, drive up to BRYANT's residence and either wait in front and meet with BRYANT for a moment before driving away or entering the residence for a very short period of time before leaving.  Of note, McCurin obtained cocaine from the N Street residence on July 23 and 27, 2019, within the same time frame that MARTIN visited the N Street residence to obtain cocaine. Law enforcement seized approximately seven ounces of cocaine from McCurin on July 27, 2019 after he left the N Street residence.  For these reasons, I believe that BRYANT was using this particular residence to store and/or manufacture cocaine and cocaine base for the purpose of distributing that cocaine and cocaine base to sub-distributors such as MARTIN, HANEY, CAINE and others.

**Maurice BRYANT is still engaged in the distribution of cocaine and cocaine base and is using his residences to store cocaine and cocaine base.**

122.   I subsequently learned in early 2020 that BRYANT had vacated the primary residence he occupied in 2019 at 541 N Street, Rio Linda, California.

123.   I traveled repeatedly to the residence at **450 Greg Thatch Circle, Sacramento, California** during 2020 and early 2021. This was the same location where I had followed BRYANT regularly during the above intercepts; where he had been

present while making intercepted calls during which he had discussed the fact that he was in the process of converting cocaine to cocaine base; and where he alternately directed multiple people, including Bobby CONNER, to come obtain cocaine and/or cocaine base from him as observed by agents.  During all the instances agents traveled to this location, BRYANT was the only person agents saw accessing the residence.

124.   In April 2020, I verified through the Sacramento Municipal Utilities District (SMUD) that utilities service at 450 Greg Thatch Circle, Sacramento, California was still in the name of Maurice BRYANT, as it had been throughout 2019, with a listed contact number of the above-described TARGET TELEPHONE 2 (916-208-4414).   This is the same account information since service was initiated at this location in February 2017.  2021 SMUD records showed that the property still listed to BRYANT with the same telephone number, but the updated remarks section from SMUD also showed "BRYANT LANDSCAPING"  which had not been included in the prior records.

125.   I also learned from SMUD that at approximately the same times utilities service at the 541 N Street, Rio Linda, California property, which had been in the name of Tia Bryant, BRYANT's wife, was terminated, utilities service was initiated in the name of Tia BRYANT in February 2020 at **8451 Buford Court, Antelope, California**.

126.   From late 2020 through April 2021, I regularly traveled to the residence at **8451 Buford Court, Antelope, California** and conducted surveillance of this location. On nearly every occasion I visited the residence, I observed vehicles registered to both Tia BRYANT and Maurice BRYANT parked in front of the residence, including a black 2016 Dodge Ram Truck, a red 2012 Kia sedan, and a silver 2014 Infinity Sedan, all of which I had previously observed Maurice BRYANT drive in the past. The vehicles registered to Tia BRYANT all listed a current registration address of 8451 Buford Court, Antelope, California. I also noted per DMV records that Tia BRYANT was the registered owner at this address of a 2021 Harley Davidson Motorcycle which had been purchased in February 2021.

127.   On April 5, 2021, I traveled to the Sacramento County Refuse North Area Recovery Station.  Prior to this date, I verified that this company provided garbage service to **8451 Buford Court, Antelope, California**.  I also verified that garbage service for that residence was provided on that date by the refuse company.  I made arrangements with the company to have the contents of the company-owned can that had been provided to the home owner placed into an empty garbage truck and brought back to the North Area Recovery Station so that I could examine it. The company employee subsequently verified to me that the company-owned can had been placed at the curb that morning by the residents of 8451 Buford Court and that the contents of the can had been placed into the empty truck and brought directly back to the yard where the truck was secured until I arrived.

128.    The employee dumped the contents of the rear hopper of the truck onto a cement
        pad and I examined the refuse.  I immediately observed throughout the refuse
        current mailers and envelopes addressed to 8451 Buford Court in Antelope,
        California. These included boxes addressed to Tia BRYANT at this location,
        which I photographed.  I also found medication boxes listing the name Mark
        MARTIN, a known sub-dealer for BRYANT, as described above.

129.    During a continued search of the refuse, I located a large amount of clear plastic
        sandwich-type bags, both cut-off knotted portions, lower empty portions, and
        portions cut away from knots, some of which bore a white powdery substance
        consistent in my training and experience with the appearance of cocaine and
        cocaine base.  I noted that the amount of residue and the number of bags appeared
        consistent with multiple ounce quantities of cocaine and/or cocaine base and
        inconsistent with legitimate use of these bags.  The trash also included a
        rectangular FoodSaver Vacuum sealed bag cut open and used rubber gloves.



130.    During a continued search of the refuse, I located a large black plastic shopping
        bag that I examined and found to contain a glass pot with an attached metal
        handle which was broken in many pieces, all of which bore a white chunky
        residue that I recognized as cocaine base.  I know based on my training and
        experience that it is not uncommon for individuals to use a pot or pan to convert
        cocaine into cocaine base and then break the pot or pan to free or remove the
        cocaine base once it hardens.  I performed a subsequent presumptive field test of
        this substance, and it tested positive for cocaine.

 



**Wilmer HARDEN is still engaged in the distribution of cocaine and cocaine base and is using his residence to store cocaine and cocaine base.**

131.    I subsequently checked with SMUD and verified that utilities service at **6105 Pine Vista Way, Elk Grove, California**, the residence where Wilmer HARDEN had been observed residing in 2019, was still as of April 2021 listed in the name of HARDEN's common-law wife, Luckrisa JONES, as it had been in 2019 and since the initiation of service at that location in June 2016. SMUD records further reflected in the remarks section that "Earl Harden" (a known moniker for HARDEN) was listed as also on the account since its inception.

132.    I also verified that despite HARDEN having continuously listed his family's residential address of 209 Olmstead Drive, Sacramento, California since 1988 through the present with DMV, HARDEN had per multiple database inquiries

39

(CLEAR, Thomas and Reuters, Sacramento Sheriff's Department) continued to provide alternate residential addresses in recent years of both **6105 Pine Vista Way, Elk Grove, California** and 4801 Laguna Boulevard, #105, Elk Grove, California. I verified that 4801 Laguna Boulevard, #105, Elk Grove, California is a mailbox at the United Parcel Service (UPS) Store at this business location and is in close proximity to the residence at 6105 Pine Vista Way, Elk Grove, California.

133.   I subsequently traveled to 6105 Pine Vista Way, Elk Grove, California on several occasions in April and May 2021.  On these occasions, I observed the same 2017 Honda, California license plate #7WNF637, which HARDEN had previously been observed driving to meet with BRYANT at times I believe he was delivering drugs, parked in the driveway of the residence. DMV inquiries revealed that this vehicle was still registered in the name of Luckrisa JONES at this location as of January 14, 2021.  I also noted from DMV records that a 2011 Lexus, California license #7KUU813, was registered in the name of Wilmer HARDEN at 6105 Pine Vista Way, Elk Grove, California as of March 16, 2021.

134.   On May 6, 2021, I traveled to the Republic Services Elder Creek Transfer Station in South Sacramento.  Prior to this date, I verified that this company provided garbage service to 6105 Pine Vista Way, Elk Grove, California.  I also verified that garbage service for this residence was provided on May 6, 2021 by the company.  I made arrangements with the company to have the company-owned can that was provided to the home owner exchanged with an empty can and to have the original can brought directly back to the Republic Services Yard so that I could examine it. The company employee subsequently verified to me that the company-owned can had been placed at the curb that morning by the residents of 6105 Pine Vista Way and that the can was brought unopened directly back to the yard where it was secured until I arrived.

135.   I subsequently photographed the taped-shut unopened can (which bore the numerals "6105") and cut the tape and opened the can and examined the refuse. I immediately observed throughout the refuse that there were current mailers and envelopes addressed to 6105 Pine Vista Way, Elk Grove, California.  These included mailers, envelopes, paperwork, etc., addressed to Wilmer HARDEN, Earl HARDEN, and Luckrisa JONES.  These included receipts for the deposit and transfers of large amounts of currency (*e.g.*, a Safe Credit Union Receipt for the movement of $20,859.00 between accounts and the withdrawal of $6,000 cash on April 25, 2021, and a Golden 1 Receipt dated April 21, 2021 documenting the withdrawal of $4,000 cash) and statements regarding Cryptocurrency accounts valued at several thousand dollars.

136.   During a continued search of the refuse, I located throughout a large amount of clear plastic sandwich-type bags, both cut-off knotted portions, lower empty portions, and portions cut away from knots, some of which bore residue.  I noted that the number of bags appeared entirely consistent with multiple ounce quantities of cocaine and/or cocaine base and inconsistent with legitimate use of

these bags.  Based on my training and experience, these items appeared consistent with narcotics packaging I had observed numerous times in the past.

137.   I transported these items to a particular location where I met with DEA Task Force Officer (TFO) James Applegate. TFO Applegate is an El Dorado County District Attorney's Office Investigator who is assigned to DEA and is a trained canine handler.  He currently works with a narcotics detection canine named Odin. TFO Applegate provided me with the following statement with regards to his and Odin's training:

> Odin is an eleven-year-old Belgian Malinois.  Odin was trained in Sacramento, California at a K9 training class instructed and overseen by K9 Instructor John Riboni, specifically for the detection of illicit narcotics.

> The training class provides the skills necessary for the officer/handler to work as a team in the detection of illicit narcotics.  The training encompassed a four-week time period.  During the course, the K-9 teams work in a variety of settings ranging from vehicles, houses, commercial buildings, commercial trucks, and various other settings.

> Odin is trained to specifically detect four different narcotic odors: marijuana, cocaine, methamphetamine, and MDMA.  Odin is trained to alert passively by staring / pointing / sitting or some type of change in his behavior when he detects the odor of these narcotics.  Odin performs his detection work for a toy reward.

> The basic narcotic training was a total of 64 hours, which Odin completed in February of 2014.  Odin was certified on February 25, 2014 by Certified K9 Instructor Detective Ben Davidson.

> Odin and handler, TFO Applegate, completed the entire training program and certification process together and both have been assigned as a team to the DEA Sacramento District Office Task Force since November 2014. Odin's training is continuous and occurs on a near daily basis on each narcotic odor.

> Odin and handler TFO James Applegate most recent certification test was executed and passed (Yearly Certification) on June of 2020 in Sacramento, California.

> Odin is continuously involved in many training exercises where known illicit narcotic substances, and containers that have previously contained these narcotics were hidden for training purposes.  Due to odor absorption, and Odin's inherently keen sense of smell, he will continue to alert on the

/ / /

container or item.  This is dependent on the length of exposure to the narcotic and the ventilation of the item or container.

138.    TFO Applegate placed the above-described items of suspected narcotics packaging at various locations not in immediate view of Odin. TFO Applegate then allowed Odin to search the area, and TFO Applegate and I noted that Odin immediately proceeded to the areas where these items had been placed.  TFO Applegate informed me that Odin proceeded directly to these items and alerted in front of these items in a fashion consistent with his alert for the odor/presence of narcotics emanating from them.

**Training and experience regarding the means and methods and practices of drug traffickers, and evidence likely to be stored at locations to be searched.**

139.    As a result of my experience and training, I have learned that traffickers who deal in various quantities of controlled substances, including cocaine, cocaine base, and heroin, or those that assist in that venture, maintain and tend to retain accounts or records of those transactions.  Such records detail amounts outstanding, owed, or expended, along with records tending to indicate the identity of co-conspirators. These records may be kept on paper or contained in memory calculators or computers.  It is also my experience that these traffickers tend to keep these accounts and records in their residence and in the areas under their control.  It is my training and experience, that in the case of drug dealers, evidence is likely to be found where the dealers live.  It is also my training and experience that where criminal activity is long-term or ongoing, equipment and records of the crime will be kept for some period of time, often several years.

140.    Based upon my experience and training, I have learned that drug traffickers often place their assets in names other than their own to avoid detection of those assets by law enforcement and the Internal Revenue Service (IRS); that those persons are commonly family members, friends, and associates who accept title of assets to avoid discovery and detection; that traffickers also often place assets in the ownership of corporate entities to avoid detection by law enforcement agencies and although these assets are in other individual(s) or corporate names, the traffickers continue to use these assets and exercise dominion and control over them. Typically traffickers keep records of those registrations and transactions in their residence.

141.    I have learned that drug traffickers often have on hand large amounts of United States currency in order to maintain and finance their ongoing business.  It has been my experience that drug traffickers often keep large sums of currency, caches of drugs, financial instruments, precious metals, jewelry, automobiles and other items of value and/or proceeds of drug transactions, including evidence of financial transactions related to obtaining, transferring, secreting or spending large sums of money acquired from engaging in the acquisition and distribution of controlled substances in their residence or in the areas under their control.

142.    In my experience, traffickers commonly have in their possession, that is, on their person, at their residence, or in other areas under their control, firearms, including but not limited to handguns, pistols, revolvers, rifles, shotguns, machine guns and other weapons.  Such firearms are used by drug traffickers to protect their illicit drug trafficking operations and themselves against law enforcement and other drug traffickers because the illicit drug trade is an inherently dangerous illegal activity involving large amounts of valuable contraband and drug proceeds.  Such property may include, but is not limited to, narcotics and other dangerous drugs, jewelry, narcotic paraphernalia, books, records, ledgers and quantities of currency.

143.    In my experience, traffickers commonly have in their possession, that is on their person, at their residences, in their vehicles, and in the areas under their control or to which they have access, drugs, including but not limited to in this case, cocaine, cocaine base, and heroin, which they intend to distribute.  It is my experience that these drug traffickers commonly use these areas (vehicles, residences, properties, etc.) as locations to conceal their narcotics from law enforcement.

144.    In my experience, drug traffickers may take or cause to be taken photographs or videos of themselves, their associates, their property, and their products.  Such traffickers often maintain photographs and/or videos at their residence or in the areas under their control.

145.    In my experience, large scale traffickers often maintain in their possession and at their residence fictitious identification, including but not limited to, driver's licenses, employment cards, insurance cards, social security cards, certificates of birth and passports which are obtained by the traffickers and used in an effort to prevent law enforcement identification of the traffickers and their drug trafficking activities.

146.    In my experience, drug traffickers often use vehicles to transport and distribute controlled substances in facilitation of their trafficking activities.  It has also been my experience that traffickers will also use vehicles as locations in which to store controlled substances prior to distribution.  During prior investigations, I have observed that drug traffickers will often use vehicles registered in the names of individuals other than themselves in an effort to avoid detection by law enforcement.

147.    In addition, these traffickers tend to attempt to legitimize their assets by establishing domestic and foreign businesses, by creating shell corporations, by using bank haven countries and attorneys specializing in drafting and establishing such entities employed to "launder" the proceeds derived from the distribution of controlled substances.

43

148.   In establishing these entities, the traffickers often must travel to meetings in foreign countries as well as domestically. As a result of that travel, records are generated reflecting travel by commercial and private aircraft, Commercial Ocean and private vessels as well as common carrier(s).

149.   Individuals involved in the distribution of drugs often make, or cause to be made, pictures, videos, movies, compact discs, digital media or other such items that are or contain photographic or digital images in order to memorialize their drug distribution, use, possession, or any other activities surrounding their drug trafficking activities, and that such items often identify co-conspirators in their drug trafficking activities.

150.   It has been my experience in the past, and particularly in this case, that when suspects use mobile telephones to communicate with cooperating individuals or undercover agents to set up the drug deals, records relating to these activities will be found stored in the cellular telephone.  And, as relevant to this case, the drug traffickers in this case have made extensive use of text messaging to communicate about this ongoing drug trafficking.

151.   I know that narcotics traffickers use mobile telephones to communicate with one another, either by voice or text message.  Mobile telephones preserve in their memory a history of incoming, outgoing, and missed calls, which can lead to evidence of the telephone numbers of other narcotics traffickers and the dates and times that they and/or the mobile telephone user dialed one another's telephones. Mobile telephones also contain in their memory a telephone book.  This allows the user to store telephone numbers and other contact information; the information stored in a telephone used by a narcotics trafficker is evidence of the associations of the narcotics trafficker, some of which are related to his or her illegal business.  Mobile telephones also contain in their memory text messages sent, received, and drafted by the mobile telephone user.  The text message history of a narcotics trafficker's mobile telephone can contain evidence of narcotics trafficking because it shows the communications or planned communications of a narcotics trafficker and the telephone numbers of those with whom the narcotics trafficker communicated or intended to communicate. Mobile telephones also have a voicemail function that allows callers to leave messages when the telephone user does not answer.  Narcotics traffickers sometimes leave voice messages for each other and this is evidence both of their mutual association and possibly their joint criminal activity.  Mobile telephones can also contain other user-entered data files such as "to-do" lists, which can provide evidence of crime when used by a narcotics trafficker. Mobile telephones can also contain photographic data files, which can be evidence of criminal activity when the user was a narcotics trafficker who took pictures of evidence of crime.  Mobile telephone companies also store the data described in this paragraph on their own servers and associate the data with particular users' mobile telephones.

152.   Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time, often several years. Even when a user deletes information from a device, it can sometimes be recovered with forensics tools. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

153.   I know based on my training and experience and knowledge of this investigation that individuals not specifically identified in this affidavit may be present and/or residing at the locations listed in Attachment A at the time of the search. I also know from my training and experience that individuals involved in drug trafficking frequently store their drugs, drug proceeds, weapons, and other contraband in rooms and areas of their residences that appear to belong to, are controlled by, and/or are accessible to other occupants, including for example, bedrooms belonging to children, other family members, or roommates, in an effort to conceal the evidence from law enforcement and to disguise their ownership and control of the contraband in the event that it is seized. This application therefore seeks permission to search the entire premises of the residence for which the warrant is sought, including any location where there is reasonable cause to believe the items listed in Attachment B may be found. *See Zurcher v. Stanford Daily*, 436 U.S. 547, 556 (1978) ("The critical element in a reasonable search is not that the owner of the property is suspected of crime but that there is reasonable cause to believe that the specific 'things' to be searched for and seized are located on the property to which entry is sought."); *United States v. Ross*, 456 U.S. 798, 820–21 (1982) ("A lawful search of fixed premises generally extends to the entire area in which the object of the search may be found and is not limited by the possibility that separate acts of entry or opening may be required to complete the search. Thus, a warrant that authorizes an officer to search a home for illegal weapons also provides authority to open closets, chests, drawers, and containers in which the weapon might be found."); *see also United States v. Adjani*, 452 F.3d 1140, 1146 (9th Cir. 2006) ("Although individuals undoubtedly have a high expectation of privacy in the files stored on their personal computers, we have never held that agents may establish probable cause to search only those items owned or possessed by the criminal suspect. The law is to the contrary.") (citing *Zurcher*); *United States v. Tehfe*, 722 F.2d 1114, 1118 (3d Cir. 1983) ("Property owned by a person absolutely innocent of any wrongdoing may nevertheless be searched under a valid warrant.") (cited with approval in *Adjani*).

154.   As described above and in **Attachment A**, this Affidavit seeks permission to search and seize things that are related to the ongoing drug trafficking conspiracies between BRYANT and others, in whatever form such things are stored.

155.   It is my opinion, based on my training and experience, and the training and experience of other law enforcement investigators to whom I have spoken, that

the items listed in **Attachment B** are items most often associated with the distribution of controlled substances, including cocaine, cocaine base, and heroin, as well as the proceeds from such illegal operations.

156.    The facts set forth in this Affidavit are known to me as a result of my personal participation in this investigation, through conversations with other agents and detectives who have participated in this investigation, and from reviewing official reports, documents, and other evidence obtained as a result of this investigation. This Affidavit is not an exhaustive enumeration of the facts that I have learned during the course of this investigation but, instead, are facts that I believe support a finding of probable cause to search the requested locations.

157.    Based on my experience and training, and after consulting with other law enforcement officers experienced in drug investigations, I know that individuals involved in drug dealing often maintain at their residences, vehicles, and on their persons the items described in **Attachment B**.  Individuals involved in drug dealing also often maintain paraphernalia for packaging, weighing, cutting, testing, distributing, and identifying controlled substances.  Therefore, I am requesting authority to seize all the items listed in **Attachment B** to this Affidavit and incorporated here by reference.

## **CONCLUSION**

158.    Based on the foregoing, I believe there is probable cause to support, and request that the Court issue complaints and arrest warrants charging:

   a.    Wilmer HARDEN, Maurice BRYANT, Tyrone ANDERSON, Charles CARTER, Bobby CONNER, Jerome ADAMS, Dwight HANEY, Arlington CAINE, and Mark MARTIN with violating 21 U.S.C. §§ 841 and 846 – conspiracy to distribute and possess with intent to distribute cocaine and cocaine base.

159.    Based on the foregoing, I also believe there is probable cause to search the following locations, and request that the Court issue search warrants for the following locations:

   a.    8451 Buford Court, Antelope, California (the residence of Maurice BRYANT);

   b.    450 Greg Thatch Circle, Sacramento, California (the stash pad of Maurice BRYANT); and

   c.    6105 Pine Vista, Elk Grove, California (the residence of Wilmer HARDEN).

### **REQUEST TO SEAL**

160.    I request that the Court order this Affidavit and associated Applications and
        Warrants be kept under seal until further order of the Court.  The criminal
        investigation against the BRYANT DTO and its members and sources is
        continuing, and further investigation and search warrants are contemplated.
        Disclosure of the contents of this Affidavit would seriously impede the
        investigation by disclosing details of the government's investigation and evidence
        gathered in connection therewith.  The subjects of the investigation would be able
        to learn the present extent of the government's knowledge and may seek to
        destroy evidence or flee from law enforcement.  Accordingly, I request that the
        Court issue an order sealing the complaint and arrest warrants and affidavit until
        further order of this Court.

I swear under penalty of perjury, that the foregoing information is true and correct to the
best of my knowledge, information, and belief.


   /s/ Brian Nehring
_____
Special Agent Brian Nehring
Drug Enforcement Administration

Sworn to and subscribed before me on the    13__ day of May 2021.



_____
DEBORAH BARNES
UNITED STATES MAGISTRATE JUDGE

Approved as to form:



Cameron L. Desmond
Assistant U.S. Attorney

**Attachment A-1**
**Locations to be Searched**

**8451 Buford Court, Antelope, California**, further described as a two story single family residence, located on the west side of Buford Court near the end of the cul-de-sac facing east, off-white in color with white trim, with the numerals 8451 in black affixed to the front of the residence to the right of the garage door, pictured below:



Including the residence, garage, all storage areas, all trash receptable, and the entire grounds and yard, including outhouses, sheds, or other storage facilities on the property. Including all vehicles over which the owner, occupant, or residence of the aforementioned premises has dominion and control, as determined by the agent at the time of the execution of the search warrant by agent's observation of such persons operating or accessing the vehicle, DMV records showing ownership or use of a vehicle, witness statements establishing ownership or use of the vehicle, or car keys to operate the vehicle found in the action or constructive possession of such person found at the residence.

**Attachment A-2**
**Locations to be Searched**

**450 Greg Thatch Circle, Sacramento, California** further described as a single family, two story residence, tan in color with olive and stone trim, located on the north side of Greg Thatch Circle facing south, with the numerals 450 affixed to the front of the residence to the right of the entryway, pictured below:



Including the residence, garage, all storage areas, all trash receptable, and the entire grounds and yard, including outhouses, sheds, or other storage facilities on the property. Including all vehicles over which the owner, occupant, or residence of the aforementioned premises has dominion and control, as determined by the agent at the time of the execution of the search warrant by agent's observation of such persons operating or accessing the vehicle, DMV records showing ownership or use of a vehicle, witness statements establishing ownership or use of the vehicle, or car keys to operate the vehicle found in the action or constructive possession of such person found at the residence.

### Attachment A-3
### Locations to be Searched

6105 Pine Vista Way, Elk Grove, California, further described as a single story, single family residence, gray in color with white trim, with the numerals 6145 in black affixed to the front of the residence to the right of the garage door, pictured below:



Including the residence, garage, all storage areas, all trash receptable, and the entire grounds and yard, including outhouses, sheds, or other storage facilities on the property. Including all vehicles over which the owner, occupant, or residence of the aforementioned premises has dominion and control, as determined by the agent at the time of the execution of the search warrant by agent's observation of such persons operating or accessing the vehicle, DMV records showing ownership or use of a vehicle, witness statements establishing ownership or use of the vehicle, or car keys to operate the vehicle found in the action or constructive possession of such person found at the residence.

**Attachment B**
**Items to be Seized**

Agents are authorized to search and seize property that constitutes evidence, fruits, and instrumentalities of violations of the following federal statutes (the "Target Offenses"), committed by Maurice BRYANT and his co-conspirators:

-   Title 21 U.S.C. Sections 846 and 841(a)(1) – Conspiracy to Distribute and Possess with Intent to Distribute Cocaine and Cocaine Base;

As further described in the Affidavit, the specific evidence, fruits, and instrumentalities of the Target Offenses for which agents may search includes:

1.  Controlled substances, including Cocaine and Cocaine Base, or items frequently used to distribute Cocaine and Cocaine Base, or items containing residue from the distribution of Cocaine and Cocaine Base; drug-trafficking paraphernalia, including scales, measuring devices, and weighing devices; narcotics diluting or cutting agents; narcotics packaging materials, including plastic, tin foil, cellophane, jars, plastic bags, and containers; and plastic surgical gloves;

2.  United States and foreign currency linked to drug trafficking and/or the proceeds of drug trafficking;

3.  Narcotics or money ledgers, narcotics distribution or customer lists, narcotics supplier lists, correspondence, notations, logs, receipts, journals, books, pay and owe sheets, records and other documents noting the price, quantity, date and/or times when narcotics were purchased, possessed, transferred, distributed, sold or concealed;

4.  Telephone paging devices, beepers, mobile phones, car phones, answering machines and tapes, and other communication devices which could be used to participate in a conspiracy to distribute controlled substances in violation of 21 U.S.C. § 841(a)(1);

5.  Bank account records, wire transfer records, bank statements, safety deposit keys and records, money wrappers, money containers, income tax returns, evidence of financial transfer, or movement of money generated from the sale of narcotics;

6.  Personal telephone books, address books and other such address listings, letters, cables, telegrams, telephone bills, photographs, audio and video tapes connected to drug trafficking, personal notes and other items reflecting names, addresses, telephone numbers, communications, and illegal activities of associates in drug trafficking activities;

7.  Financial instruments purchased with large amounts of currency derived from the sale of controlled substances, including travelers checks, bonds, stock certificates,

cashier's checks and certificates of deposit; money counting machines, money wrappers and bags used to carry controlled substances;

8.      Records, documents and deeds reflecting the purchase or lease of real estate, vehicles, precious metals, jewelry, or other items obtained with the proceeds from the sale of controlled substances;

9.      Records, items, and documents reflecting travel, including airline tickets, credit card receipts, travel vouchers, hotel and restaurant receipts, canceled checks, maps and written directions to location;

10.     Handguns, shotguns, rifles, explosives, and other firearms/incendiary devices and ammunition that may be used to facilitate the distribution or possession of, with the intent to distribute controlled substances or discovered in the possession of a prohibited person;

11.     Indicia of occupancy, residency, control or ownership of the premises and things described in this warrant, including utility bills, telephone bills, loan payment receipts, rent documents, canceled envelopes and keys, photographs, and bank records; and

12.     All names, words, telephone numbers, email addresses, time/date information, messages or other electronic data in the memory of the mobile telephone or on a server and associated with mobile telephones that are associated with the subject individuals during execution of the warrant.  This authority to search such mobile telephones includes the following within each mobile telephone:

    A.      Incoming call history;
    B.      Outgoing call history;
    C.      Missed call history;
    D.      Outgoing text messages;
    E.      Incoming text messages;
    F.      Draft text messages;
    G.      Telephone book;
    H.      Data screen or file identifying the telephone number associated with the mobile telephone searched;
    I.      Data screen, file, or writing containing serial numbers or other information to identify the mobile telephone searched;
    J.      Voicemail;
    K.      User-entered messages (such as to-do lists);
    L.      Photographs; and
    M.      Any passwords used to access the electronic data described above.